## Sublett's Admr. v. C. & O. Ry. Co.

(Decided February 1, 1912.)

Appeal from Johnson Circuit Court.

1.  Railroads—Duty Owing to Licensees and Trespassers.—A railroad company, in the operation of its trains at places where the habitual and continuous use of its tracks by the public imposes upon it the duty of anticipating the presence of travelers, is required to keep a lookout, to give reasonable warning of the approach of trains, and operate them at a reasonable speed; but no duty is owing to a trespasser except to exercise ordinary care to avoid injury to him after his peril is discovered.

2.  Same—Licensees, Who Are.—Where large numbers of the public habitually and continuously use the tracks of a railroad company, with its knowledge and consent or its implied acquiescence, they are to be treated as licensees and accorded the protection owing to this class of persons; but, as a general rule, the public in the use of the tracks will not be treated as licensees except in cities and thickly populated communities.

3.  Same—Trespassers, Who Are.—All persons are trespassers who, without right so to do, use the tracks of a railroad company at places where the public have no right to be or at places where the use of the tracks by the public is not of such a character as to convert the users into licensees.

C. B. WHEELER for appellant.

M. C. KIRK, WORTHINGTON, COCHRAN & BROWNING and F. T. D. WALLACE for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

On December 25th, between 5 and 6 o'clock in the evening, Lode Sublett while on the track of appellant company, was killed by one of its engines. To recover damages for his death his administrator brought this suit, and, after hearing all the evidence for both plaintiff and defendant, the trial court directed a verdict for the defendant railway company. The only question is—should the case have gone to the jury?

The evidence shows that the deceased, who was in an intoxicated condition, was walking on the railroad track between Paintsville depot and the railroad bridge across Paint creek, going in the direction of the bridge. At a point some 1,100 feet from the bridge and about 1,600 feet from the depot, he fell on the track, and in a few moments afterwards and while in this prostrate condition, was run over and killed by an engine running extra on its way to Pikeville. The railway company rested its defense to the action upon the ground that the deceased was a trespasser and consequently it did not owe him any duty except to exercise reasonable care to prevent injury to him after his peril was dis-

covered by the persons in charge of the engine, and on the other hand, the right to recover was grounded upon the theory that the habitual and continuous use of the railroad track by the public at the point where the deceased was killed was sufficient to put upon the company in the operation of its engines and trains the duty of anticipating the presence of persons on the track, and the further duty of exercising care to avoid injury to them by keeping a lookout, giving warning of the approach of its engines and trains, and running at a reasonable rate of speed. If the deceased was not a trespasser, and the company owed him the duty of lookout and warning, there was evidence sufficient to take the case to the jury, as it was testified to by several persons that the engine was running at a high rate of speed, that the bell was not ringing or the whistle sounded, and that the headlight on the engine if lighted at all was burning very dimly. But if the deceased was a trespasser, the ruling of the trial judge was correct.

The depot at Paintsville is situated probably a mile from the town of Paintsville, and the town of Paintsville is also quite a distance from the railroad, and between the depot and the town runs Paint creek. The railway to the Paintsville depot was completed about a year before the accident, and it is shown by a number of witnesses that before the county bridge was built across Paint creek on the county road leading from Paintsville to the depot, and during the winter and early spring when the creek was often high and the road leading from Paintsville to the depot muddy, a great many people from the town of Paintsville and vicinity in going to the depot would go on the Paintsville side of the creek to the railroad at or near the railroad bridge, and then crossing the creek on the railroad bridge, walk to the depot on the track; and, so persons who desired to go to Paintsville would get off the trains at the depot and walk on the track to the bridge and cross the creek on the railroad bridge. It is also shown that before the county bridge was built, it was not uncommon during the high water and bad weather for passenger trains to stop on the Paintsville side of the railroad bridge and let off passengers who desired to go to Paintsville; and that frequently trunks and baggage would be hauled from Paintsville to the railroad bridge and then carried down the track to the depot. In fact, from the time the railroad was completed until the

county bridge was built, there was during the winter season a good deal of travel along the railroad track from the Paintsville railroad bridge to the depot. This was especially true at times when the creek was high and at times when the road from Paintsville to the depot was muddy. But the county bridge, as well as the approaches to it were completed in November, 1905, and after that time the travel on the railroad greatly decreased, as passengers could travel to and from the town of Paintsville and the depot on the county road, although after the bridge was completed and in rainy weather and when the county road was muddy, occasionally persons would go from Paintsville to the railroad bridge as they formerly did and walk down the track to the depot. But the building of the county bridge made it unnecessary for persons getting off or on the trains to use the railroad track and the railroad bridge, although they sometimes did so when the county road from Paintsville to the depot was in practically an impassable condition for vehicles, which occasionally happened. It does not appear that the railway company at any time authorized persons to use its track between the railroad bridge and the depot and appropriate sign-boards had been put up prohibiting such use. Indeed, it may safely be said that the track was used by the public at all times, both before and after the county bridge was built, as a matter of convenience to avoid the creek and bad roads rather than by the permission of the railroad company, although it was used much more frequently before the county bridge was built than afterwards. But there was no reason at any time after the county bridge was completed why persons walking should use the railroad track in place of the county road, as it is shown that after the bridge was built travelers on foot could at all times conveniently travel the public road in going to and from the town of Paintsville and vicinity to the depot. It might also be said in this connection that before the county bridge was built, the use of the track was confined almost entirely to persons who desired to go to the depot for the purpose of getting on trains or who got off of trains at the depot, as it does not appear that any person lived along the railroad between the bridge and the depot; nor is it shown that there were any stores or other buildings about the depot that would attract the public. It is also in evidence that at the point where the deceased was killed

and indeed along the side of the track from the bridge to the depot, there was a space on which the traveler desiring to go from one place to the other might walk without getting on the railroad track.

To sum up the situation as we gather it from the record, the railroad track between the railroad bridge and the depot was not used by many of the public at or about the time deceased was killed.   That it was used by some persons, as indeed are nearly all railroad tracks in the State, is not sufficient to convert the users from trespassers into licensees.   It is not, of course, entirely practicable to set down the exact number of persons that must use a railroad track, or the length of time they must have been using it, to put upon the company the duty of anticipating their presence and taking care to protect them.   Each case, as a rule, must be judged by the facts it presents.   But, we have laid down a few rules of general application.   Among them, we may take the following from C. & O. Ry. Co. v. Nipp, 125 Ky., 49, where it is said:

"But the operation of this rule has been confined to cities and thickly populated communities, and has not been, and will not be, extended to rural communities or sparsely settled regions, although footpaths crossing the track and the right of way may be used by a large number of persons each day.   In the country districts traversed by lines of railway, it is no uncommon thing for numbers of persons in going to public places, such as school houses, churches, stores and the like, to use paths or ways that cross railroad tracks, but that are not private or farm crossings, and also to travel upon the right of way and tracks of the company.   It may be also conceded that these persons use the right of way and tracks of the company with acquiescence, in the sense that it does not interfere with their use, or takes steps to prevent it; but this use by individuals of the tracks and right of way of railroad companies in places of this character does not convert them from trespassers into licensees.   Nor does it impose upon the company any duty of lookout or warning.   Persons who thus use the tracks and right of way do so at their peril.   They are trespassing upon dangerous premises, and assume the risk of any accident that may befall them by passing trains."   To the same effect is Gregory v. L. & N. R. Co., 25 Ky. L. R.,

1986; C. & O. Ry. Co. v. See's Admr., 25 Ky. L. R., 1995; Brown v. L. & N. R. Co., 97 Ky., 228; C. & O. Ry. Co. v. Perkins, 20 Ky. L. R., 608; Wilmuth's Admr. v. Illinois Central R. Co., 25 Ky. L. R., 671; L. & N. R. Co. v. Redmon's Admx., 122 Ky., 385; Miller v. Illinois Central R. Co., 118 S. W., 348.

The place at which deceased was killed was in the country. There were no houses on either side of the track within a distance of probably a half mile. There was no crossing of any kind, and, aside from the use of the road as a matter of convenience by persons going to and from the depot, there was no reason why the track at the point where the deceased was killed should have been used by the public. If, under the circumstances of this case the deceased should be treated as a licensee, and the duty owing to licensees exacted from the company, there would scarcely be a spot on any railroad in the State at which persons would not be entitled to be treated as licensees. The habit of the public in using railroad tracks is essentially dangerous at any time or place. Operators of engines and trains can not reasonably or properly be expected to at all times be on the lookout for persons who have no right to use the tracks; as a general rule their time and attention is taken up with the performance of the duties imposed upon them in the operation of the train and the observance of the statutory and other duties imposed for the protection of the public as well as passengers and employes. As very aptly said in Gregory v. L. & N. R. Co., 25 Ky. L. R., 1986:

"The fact that footmen sometimes and very frequently used the tracks everywhere can not be held to give them any right to do so, nor can that fact lessen the right of the company to run its trains over its tracks without taking their possible presence into consideration. * * * Many people in small villages along railways, and those living near the railway, are constantly using the tracks to walk along. There is no way to keep them from it. Appellant's contention that the railway company should run its trains having in view the safety of these trespassers, would be to practically abandon the road to them. If at every curve, bridge, tunnel, cut and fill not plainly in view for a long distance the train would have to slow up, give signals and warnings, and take extraordinary precautions on

account of possible trespassers, because other trespassers were in the habit of using the track, it would so retard as to practically destroy the railroad business."

It is said, however, that although the deceased be treated as a trespasser, that there was some evidence that the persons in charge of the engine discovered his presence on the track in time to have avoided killing him. There was no eye witness to the accident. The nearest approach was a boy who was some distance off and who testified that he saw deceased fall on the track and about the same time heard the train coming, and, thereupon, turning his face from the railroad, walked in an opposite direction so that he might not see the deceased killed. The trainmen in charge of the engine testified that they did not see the deceased, nor did they know anything about the accident until they reached Pikeville, several miles distant. There is evidence that the track is straight for a distance of several hundred feet from the point where deceased was struck, in the direction from which the engine was approaching, and the engineer testified that the engine could have been stopped at the speed it was running in about a hundred feet; so that, if the persons in charge of the engine saw deceased lying on the track at a time when by keeping a lookout his presence might have been discovered, the engine could have been stopped before striking him. But there is a total failure of proof to show that the persons in charge of the engine at any time discovered the presence of the deceased on the track. The reason for this probably being that he was lying flat on some part of the track, and it was just beginning to get dark and rather difficult to discern objects. The fact that the headlight was dimly burning, or not lighted at all, as some witnesses say, although the evidence upon this point is very conflicting, is not to be taken as negligence of the company if the deceased was a trespasser, as the company did not owe him the duty of having its headlight burning, or the bell ringing, or its speed reasonable, or its trainmen on the lookout. The only contingency that would make it liable would be to fail to exercise ordinary care to protect him after his peril was discovered.

Looking at the matter from every standpoint most favorable to the contention of appellant, we are unable

to find any evidence that would justify us in remanding the case for a new trial.

Wherefore the judgment of the lower court is affirmed.