# Chesapeake & O. Ry. Co. et al. v. Hayes' Adm'r.

March 24, 1939.

Le:WRIGHT BROWNING and COMBS & COMBS for appellants.
HOWARD & MAYO for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Reversing.

This action was filed by appellee alleging that his intestate was run over and killed as a result of the negligent operation of one of appellants' trains. On a trial before a jury verdict was returned in appellee's favor for $20,000 and from judgment entered on that verdict this appeal is prosecuted.

The Long Fork subdivision of appellants' Big Sandy Division extends from Martin to Weeksbury in Floyd County, and on this branch near Clear Creek Station are tunnels Nos. 4 and 5, called the Twin Tunnels. Tunnel No. 5 is nearer Weeksbury and is called the upper tunnel and a train running from Weeksbury to Martin, a westbound train, passes first through No. 5 tunnel, which is 212 feet in length. Between the two tunnels there is a space of approximately 450 feet and in this open space is a road crossing and a bridge over the left fork of Beaver Creek. Tunnel No. 4, known as the lower tunnel, is 423 feet in length.

About 2 P. M. on April 28, 1935, the decedent, at a point somewhere between 90 and 200 feet from the west

exit of the lower tunnel, was sitting on one of the rails leaning over with his face in his hands, elbows on his knees. This appears from the testimony of several witnesses who testify that they saw the decedent sitting in this position while the train was approaching him. The engineer testifies that from the time the train entered the upper tunnel he was looking down the track in the direction of the place of accident; that about 30 or 40 feet before the train struck decedent he saw an object lying on the track in the tunnel but never thought at any time that it was a man. He states that it appeared to him to be a rock or some flat object. When the train stopped for water about a quarter of a mile below the tunnel, the brakeman walked back to the tunnel to drop a fusee for the purpose of protecting the rear of the train and discovered the decedent's body, whereupon he reported his discovery to the conductor and the train was then backed to the tunnel. The decedent's body was found at the lower end of the tunnel and evidently had been carried or dragged there by the train from the point of the accident.

The train involved in the accident was a passenger train consisting of the engine, tender and two coaches and was running at a speed of about 30 miles per hour. According to the testimony, the train could not have been stopped in less than 600 to 1000 feet. The evidence also discloses that the track for a distance of 1410 feet east of the point where the decedent was struck was straight and several witnesses testified that at the beginning of the straightaway, 1410 feet from the point of the accident, a man sitting on the rail in the lower tunnel at or near the point where decedent was struck, could have been seen by the engineer and fireman on an approaching train. A camera was set up at the beginning of the straightaway, 1410 feet from the accident, and pictures taken which showed a man sitting on the rail in the tunnel at approximately the point where the decedent was killed, these pictures being in evidence. It appears also that the rails are visible, even in the tunnels, from this point.

It is conceded that the decedent was a trespasser at the time he was killed and that the railroad company owed to him the duty only of exercising ordinary care to prevent injuring him after his peril was discovered. As it appears from the evidence that no warning signal was sounded and no attempt was made to stop the train, the

only question remaining in the case is whether or not the evidence was sufficient to justify a submission to the jury of the question whether the peril of the decedent was discovered by the engineer or fireman in time to have taken any steps to prevent his injuries.

An examination of the many cases cited and relied on by both sides reveals that there is little doubt as to the general principle of law applicable in actions of this type; the chief difficulty is in the application of the legal principles to the facts in each particular case.

The general rule on which appellee relies to sustain the judgment was declared in a number of earlier cases and stated in the case of Johnson, Adm'x v. Sandy Valley & Elkhorn Railway Company, 181 Ky. 539, 205 S. W. 576, as follows:

"Thus it has been held that evidence that the injured party was on the track, that the track was straight, that the view for a long distance was unobstructed, and that the engineer was looking towards the trespasser was sufficient to take the case to the jury."

There has been no departure from this rule in subsequent cases. The only difficulty in subsequent cases was to determine whether or not the facts and circumstances in each particular case brought it within the application of the rule.

The turning point in numerous cases seems to have been as to the liberality or strictness of meaning to be given to the word "unobstructed," or, rather, to determine when the view was unobstructed within the meaning of the above quoted rule. Our consideration of the decided cases discloses that the evidence was held sufficient to go to the jury where it was shown that the track was straight, that there was for a long distance an unobstructed view, and that the engineer was looking toward a trespasser walking or sitting on the track *at a time when visibility was unimpaired by atmospheric or other conditions.* In short, recovery was upheld in cases where it appeared that the only logical conclusion to be drawn from the evidence by the mind of a reasonable man was that the trespasser's peril was actually discovered by those in charge of the train in time, by the exercise of ordinary care, to avoid injuring him. Louisville & Nashville Railroad Company v. Bell, 108 S. W. 335, 32 Ky. Law Rep. 1312; Becker v. Louisville & Nash-

ville Railroad Company, 110 Ky. 474, 61 S. W. 997, 22 Ky. Law Rep. 1893, 53 L. R. A. 267, 96 Am. St. Rep. 459; Louisville & Nashville Railroad Company v. Nickell, 208 Ky. 60, 270 S. W. 487; Tennessee Central Railroad Company v. Cook, 146 Ky. 372, 142 S. W. 683; Louisville & Nashville Railroad Company v. Spicer's Adm'r, 187 Ky. 601, 219 S. W. 1047; Chesapeake & Ohio Railway Company v. McDonald, 239 Ky. 258, 39 S. W. (2d) 253.

In numerous other cases where the accident was on a curve, where the trespasser was *lying* on the track, or where visibility was impaired by atmospheric conditions or for any other reason was subnormal or where any other special circumstances rendered it unlikely that the trespasser's peril was discovered, it was held that the evidence was insufficient to warrant a submission of the case to the jury. In this line of cases the circumstances and conditions were as consistent with the fact that the trespasser was not seen as with the fact that he was seen, and were not such that the only reasonable inference to be drawn from the evidence was that he was seen by those in charge of the train. Johnson, Adm'x, v. Sandy Valley & Elkhorn Railroad Company, supra; Coleman's Adm'r v. Chesapeake & Ohio Railway Company, 246 Ky. 29, 54 S. W. (2d) 361; Chesapeake & Ohio Railway Company v. Prater's Adm'x, 251 Ky. 84, 64 S. W. (2d) 463; Davis, Director General, v. Crawford's Adm'x, 203 Ky. 71, 261 S. W. 835; Willis' Adm'x v. Louisville & Nashville Railroad Company, 164 Ky. 124, 175 S. W. 18; Sublett's Adm'r v. Chesapeake & Ohio Railway Company, 146 Ky. 530, 142 S. W. 1060; Goodman's Adm'r v. Louisville & Nashville Railroad Company, 116 Ky. 900, 77 S. W. 174, 25 Ky. Law Rep. 1086, 63 L. R. A. 657.

In all cases where there might be said to be peculiar or unusual conditions rendering the view obstructed, or where conditions were such that there was no reasonable degree of certainty that the trespasser's peril was discovered, it was held that the evidence was insufficient to go to the jury; for instance, where the train was coming around a curve and there was a sloping hillside (Coleman case) or where it was dark (Prater case), or where the trespasser was lying on the track at dusk and the atmosphere was hazy (Crawford case), or where the trespasser was lying flat on the track and it was just beginning to get dark (Sublett case), or where a child was *lying* upon the track at a point 230

yards from a public crossing (Goodman case), or where the view was obstructed by the side of a bridge (Johnson case). In each of these cases recovery was denied.

In the case at bar the evidence does not establish that there was a clear unobstructed view of the track with nothing to prevent the engineer seeing the decedent. Two tunnels intervened between the beginning of the straightaway track and the point where the deceased was sitting in the tunnel; between these tunnels was the open space of 450 feet in which a highway crossed the track, this crossing being a natural danger point, calling for the engineer's attention.

We know as a matter of common knowledge that the vision of the engineer was necessarily affected by each change in the amount of light or glare occurring as a result of running into and out of the tunnels—an appreciable length of time was necessarily required for each readjustment of vision. We may safely assume that with this train operating at a speed of 30 miles per hour there was almost a continual dilation and contraction of the pupils of the engineer's eyes from the time of entry into the first tunnel until the deceased was struck.

It is true that the pictures introduced in evidence reveal with a fair degree of clearness a man sitting on the rail in the lower tunnel and much stress is laid by the appellee on these photographs and on the testimony of witnesses that from the beginning of the straightaway a man could be seen sitting on the rail near the mouth of the lower tunnel. However, the question is not what *could* be seen by the engineer, but whether or not he actually *did* see and discover the deceased's peril. We know as a matter of common knowledge that these tunnels, although they could be seen through, necessarily cast a certain amount of shadow which most certainly interfered with vision and visibility. We also realize that the camera reveals with a degree of clearness many things not seen at all by the naked eye.

In speaking of the value of tests of the kind and character made in this case, and testified to in the evidence, this court, in Early's Adm'r v. L., H. & St. L. R. Company, 115 Ky. 13, 72 S. W. 348, 350, 24 Ky. Law Rep. 1807, said:

"We do not attribute to the tests made by some of the witnesses as to the distances from which certain objects placed by them on the railroad track at the

point of the accident could be seen, the importance attached to them by counsel for appellant, for we know that objects to which the attention is called in advance can more readily be seen and identified by a person stationed on the ground at a given distance than by one on a rapidly moving train, however keen his vision, or constant his outlook on the track ahead of the train.''

We are unwilling to extend the application of the rule in question to the point of declaring that it applies to the facts of the present case—we think the facts of the case take it out of that rule. In no sense do we feel that it may be said that there was a *clear, unobstructed view* of the decedent by those in charge of the train. On the contrary, a mere statement of the physical conditions at the point of the accident impels a reasonable mind to the conclusion that the evidence is not sufficient to show that the engineer could not have failed to discover the decedent's peril in time to have taken some steps to avoid injuring him. We have reached the conclusion that the evidence was insufficient to go to the jury on the question of the discovery of deceased's peril in time to make an effort to avoid running over him with the train and that the court should have directed a verdict in appellant's behalf.

The judgment is reversed.

The Whole Court sitting.