## Willis' Administratrix v. Louisville & Nashville Railroad Company.

(Decided April 15, 1915.)

Appeal from Kenton Circuit Court
(Common Law and Equity Division).

1. Railroads—Trespassers on Tracks—Duty Owing to.—The only duty a railroad company owes a trespasser on its tracks is to prevent injuring him after his peril is discovered. It is under no duty to exercise ordinary care, or any care, to discover the presence of a trespasser on the track. But if the persons in charge of the train discover that a trespasser on the track is in danger, they must then exercise ordinary care by the means at their command to save him from injury.

2. Railroads—Trespassers on Tracks—Duty Owing to.—Although an engineer may see a person walking on the track in front of the engine at a point so far distant that he is not in any immediate danger, his presence does not put upon the engineer the duty of giving warning of the approach of the train or of taking other action in anticipation of the fact that the traveler may not leave

the track. He may assume that the traveler will leave the track in time to avoid injury.

3. Railroads—Trespassers on Tracks—Duty to.—It will not be presumed that trainmen discovered the peril of a trespasser on the track from the mere fact that the track was straight or that the enginemen were seen keeping a lookout at such a distance from the trespasser as not to put on them the duty of anticipating that he would remain on the track.

4. Railroads—Trespassers on Tracks—Duty to.—If persons in charge of an engine are seen looking ahead at a time when the trespasser is in plain view and in such close proximity to the train as that it might be reasonably anticipated that he was not aware of its approach, and they fail to give any warning or take any steps to avoid injury, this evidence would be sufficient to take the case to the jury on the theory that after discovering the peril of the trespasser they failed to take the required care to avoid injury to him.

5. Railroads—Trespassers on Tracks—Licensees.—A person walking on a railroad track out in the country is a trespasser and not a licensee, although the track may be used by a number of trespassers each day.

6. Railroads—Trespassers on Tracks—Licensees.—The mere use of a railroad track by the public does not convert the users from trespassers into licensees unless this use is at a place where the public have a right to go and be, as at a public crossing and the like, or unless it is in a city or town or populous community where large numbers of people use the tracks.

B. F. GRAZIANI and HORACE W. ROOT for appellant.

S. D. ROUSE and BENJ. D. WARFIELD for appellee.

Opinion of the Court by Judge Carroll—Affirming.

B. E. Willis, while walking on the track of the railroad company in the day time, was struck and killed by a passing train, and this suit was brought by his administratrix to recover damages for his death, which, it was alleged, was caused by the negligence of the employes in charge of the engine that struck and killed him.

On a trial of the case, after the evidence for the plaintiff had been introduced, the trial judge instructed the jury to return a verdict for the defendant, and from the judgment on the verdict this appeal is prosecuted.

As the only ground urged for reversal is the failure of the trial court to submit the case to the jury, it will be necessary to set out the substance of the evidence offered for the plaintiff.

The railroad company has a double track railroad running from Covington, Kentucky, on the north to a place called Morning View on the south. Some three miles north of Morning View is a station called Benton, and the residence of decedent at which he lived was situated near the railroad track about one-half mile south of Benton and between it and Morning View. Benton is a little village with two stores, a postoffice and blacksmith shop. A turnpike crosses the railroad tracks at Benton and runs south on the west side of the railroad close to and parallel with it for more than one-half mile, and then turns abruptly to the west. On the east side of the turnpike, between it and the railroad and Benton and the residence of decedent, there are three residences, and on the west side of the railroad between these points there is one residence. On the west side of the turnpike and between Benton and the residence of decedent there are six residences, and south of the residence of decedent there are other residences located near the track.

There was evidence tending to show that from 15 to 125 persons walked on the tracks daily between Benton and the residence of decedent, some of the witnesses placing the number as low as 15 and others as high as 125; but in making these estimates the witnesses included the trips made by the same persons, many of whom used the tracks several times a day. All of these persons did not, however, live between decedent's residence and Benton, as many who used the tracks lived north of Benton and south of decedent.

The decedent, at the time of the accident, was returning to his home from Benton and when about one-fourth of a mile from the station was struck by a passenger train going south, or in the direction he was walking. The tender of the engine, which was equipped with a cow-catcher, was in front of the engine, and it appears that the track between Benton and the place where decedent was struck, and for some distance south thereof, was perfectly straight and free from any obstructions that would prevent the persons in the engine from seeing decedent if they had been keeping a lookout. The train that struck him was running probably 30 miles an hour, and from the fact that the whistle was not sounded or the train stopped, it is quite evident that the persons in the engine did not discover

the presence of the decedent on the track or know that he had been hit by the tender of the engine.

A colored man who was going from Morning View to Benton passed decedent on the track, and about this time heard the train, which was then north of Benton, whistle for the station. This man, after passing decedent, walked towards the station, at which the train stopped for a few minutes. He testifies that when the train passed him near Benton the engineer was looking out of the cab window, but the point where the engine passed this man was nearly one-fourth of a mile from the place at which decedent was struck, and whether the engineer continued to look out of the window in the direction the train was going or occupied himself with other duties, is not shown, as this witness is the only person who saw the train after it left Benton station or decedent from the time he left the station until after he was struck.

It is also shown that 30 or 40 trains passed over these tracks each day and that decedent had lived at the same place for many years.

It is urged upon two grounds that the case should have gone to the jury: First, that, assuming the decedent was a trespasser, the persons in charge of the engine discovered his peril in time to have warned him of the approach of the train and to have thus probably avoided the accident; and the failure to warn him of the approach of the train, or take such other action as might have resulted in avoiding the injury to him, after discovering his peril, was such negligence as entitled the plaintiff to go to the jury. The second ground is that a sufficient number of people habitually used the tracks at the place in question to put upon the railroad company the duty of anticipating their presence on the track, and the correlative duty of exercising the required care to avoid injury to them.

In disposing of the first point on the assumption that the decedent was a trespasser, it has been announced a number of times by this court that the only duty a railroad company owes a trespasser is to exercise ordinary care to prevent injuring him after his peril is discovered. A railroad company is under no duty to exercise ordinary care, or any care, to discover the presence of a trespasser on the track. It is under no duty to anticipate his presence on the track. It may proceed

about its business without giving any thought or care to trespassers until after their presence and danger has been discovered, and it is only when the presence and danger of a trespasser has been discovered that the duty arises to exercise ordinary care to avoid injuring him. This rule is thought by some persons to be harsh and inhuman, but, upon reflection, we think it will be found that it is neither. Persons in charge of railroad trains have great responsibilities and exacting duties to perform in looking after the safety of the passengers and property in their care and guarding against accidents to persons who have a right to use the tracks, and the attention of trainmen should not be diverted from the discharge of these imperative duties by looking out for and taking care not to harm those who may be found at almost every place trespassing on the premises and tracks of the company. A trespasser on railroad premises takes things as he finds them. He must take care of himself. He has no right to be where he is, and persons having business there are not required to be on the lookout for his presence or anticipate his intrusion on premises that are known by all men to be extremely dangerous.

No person, however, has the right to wantonly or needlessly cripple or kill a human being, although he may be careless and reckless or a trespasser on forbidden premises; and so we have written in a number of cases that if the persons in charge of a train discover that a person on the track is in danger, they must then exercise ordinary care, by the means at their command, to save him from injury. Rager v. L. & N. R. R. Co., 137 Ky., 811; L. & N. R. R. Co. v. Redmon, 122 Ky., 385; Brown v. L. & N. R. R. Co., 97 Ky., 228; Creager v. I. C. R. Co., 134 Ky., 543; N. C. & St. Louis Ry. Co. v. Bean, 110 S. W., 328; L. & N. R. R. Co. v. Logsdon, 118 Ky., 600; Goodman v. L. & N. R. R. Co., 116 Ky., 900.

Applying now these undisputed principles to the facts of this case, the argument is made on behalf of the plaintiff that, as the track between Benton station and the point where decedent was killed was straight and free from obstruction, and the engineer was seen to be looking out of his cab window several hundred feet before decedent was struck, the presumption should be that the engineer either then saw the decedent on the track or continued to look out of his cab window as

the train approached the decedent, and this being so, he must have discovered his peril in time to give some warning of the approach of the train or to have exercised in other ways or by other means ordinary care to have avoided striking him.

The difficulty, however, with this theory is that there is not a particle of evidence to support it, nor can it be reasonably inferred from the evidence of the only witness who observed the engineer looking out of his cab, that the engineer saw at this time the decedent on the track, or that he was looking out of the cab window a moment afterwards. At the time this witness saw the engineer looking out of his cab window the engine was such a distance from decedent that he could not be said to be in peril if the engineer had then seen him. At the time this witness saw the engineer looking out of the window the engineer may have seen the decedent, who was several hundred feet away, or he may not have seen him. It is clear, however, that at this time the train was not so close to the decedent as to put upon the engineer, if he did see him, the duty of warning him of its presence. On the contrary, if he did see him at this point, he might, in the exercise of ordinary care, have concluded that in proper time the decedent would leave the track. The mere fact that an engineer may see a person walking on the track in front of the engine several hundred feet away, at a point where he can easily and quickly step from the track and escape injury, and when he is not in any immediate or even apparent danger, does not put upon the engineer the duty of giving warning of the approach of the train or of taking other action in anticipation of the fact that the traveler may not leave the track.

We have written in a number of cases that if an engineer sees a person on the track some distance ahead of the engine, and when he is not in any immediate danger, he has the right to assume that the traveler will leave the track in time to avoid injury, especially when the conditions, as in this case, are such that he can do so quickly and with ease and safety. Reynolds' Admr. v. C., N. O., & T. P. Ry. Co., 148 Ky., 252; L. & N. R. R. Co. v. Hunt's Admr., 142 Ky., 778; Murray v. Southern Ry. Co., 140 Ky., 453; L. & N. R. R. Co. v. Weiser's Admr., 164 Ky., 23.

So that if it should be assumed—and it would be a mere assumption—that the engineer saw the decedent on the track at the time the engine was at the point testified to by the witness, the company is not to be charged with negligence because the engineer failed to continue to keep a lookout or because he failed to give any warning of the approach of the train in anticipation that the person he saw on the track might not leave it. Nor is' it to be reasonably inferred that the engineer continued to look out of the cab window. A moment after this witness saw the engineer some duty connected with the operation of the engine may have caused him to withdraw his lookout, and it is more reasonable to conclude that this happened than it is to conclude that the engineer, after discovering that the decedent was in danger, failed to give any warning of the approach of the train or to stop after he had been knocked from the track.

Counsel for the appellant call attention to the case of Becker v. L. & N. R. R. Co., 110 Ky., 474, as authority for the proposition that when the engineer is seen looking out of the cab window several hundred feet from persons on the track, the presumption will be indulged that he continued to keep this lookout, but failed to exercise the duty of taking care to prevent the accident after the peril of the person on the track was discovered. In the Becker case five children were walking across a railroad bridge,. and the court held that there was sufficient evidence to show that the engineer discovered the peril they were in soon enough to have averted injury to them. But, as said in Goodman's Admr. v. L. & N. R. R. Co, 116 Ky., 900: "This court has repeatedly held that a railroad company owes no duty to trespassers upon its track at places not frequented by the public by right or permission, until their peril has been discovered. And we do not understand that this well-grounded rule was changed by the decision in Becker v. L. & N."

The case of L. & N. R. R. v. Bell, 32 Ky. L. R., 1312, is also relied on; but in that case the court said there was sufficient evidence to show that the trainmen saw the trespasser in time to take steps to prevent injury to her.

This court has written many cases on the subject of the duty and liability of a railroad company in respect to trespassers, but as it rarely happens that the facts

of any two cases are alike, this condition makes it diffi-
cult at times to apply well-settled principles of law so
as to avoid some apparent confusion in the conclusion
reached by the court. In every case, however, that has
come under our notice the court has adhered to the doc-
trine that a railroad company owes no duty to a tres-
passer except to exercise ordinary care to avoid injury
to him after his peril is discovered, and we think it may
safely be laid down that no presumption will be indulged
that the trainmen discovered the peril from the mere
fact that the track was straight or that the enginemen
were seen keeping a lookout at such a distance from the
trespasser as not to put on them the duty of anticipating
that he would remain on the track.

If, however, the persons in charge of an engine were
seen looking ahead at a time when the trespasser was
in plain view, and in such close proximity to the train
as that in the exercise of reasonable care they might
anticipate that he was not aware of its approach or ap-
prehensive of his danger, and they failed to give any
warning of the approach of the train or take any steps
to avoid injury, this evidence would be sufficient to take
the case to the jury on the theory that after discovering
the peril of the trespasser, they failed to take the re-
quired care to avoid injury to him. But this condition
did not exist in this case, and therefore there was no
evidence to take the case to the jury upon this issue.

The remaining question is, were the conditions and
the travel on the track at the place where decedent was
struck such as to put upon the railroad company the duty
of anticipating the presence of persons on the track and
the duty of exercising the corresponding care required
when this duty exists? The place where decedent was
struck was out in the country. It was not within the
limits of any incorporated town or city or in a populous
community, nor was the volume of travel on the track
sufficient to convert persons using it into licensees to
whom the duty of warning and lookout would be owing.

If, under the facts of this case, a railroad company
would be under the necessity of treating persons on its
track as licensees, there would scarcely be a mile of
track on any railroad in the State to which this duty
would not apply. The decedent lived a half-mile from
the little station of Benton, at which place there were
three or four houses. On the side of the railroad on

which he lived there was only one house between his residence and the depot, and on the other side of the track and between it and the turnpike there were only three houses, although on the far side of the turnpike from the railroad there were three other houses. In short, there is hardly a half-mile of track on any old railroad in the State on which there are not as many houses and as many people living as there were between Benton and the residence of decedent. It is true there was evidence by perhaps one or more witnesses to the effect that as many as 125 people used these tracks every day, but other witnesses, with equal opportunities of knowledge, said the number of persons would be probably 15, except on some special occasion when there was unusual travel. But if the number should be placed at 125, this would not be sufficient under the conditions surrounding this territory to convert these users into licensees, as it seems perfectly apparent from the undisputed evidence as to the number of people in the territory adjacent to the railroad and around and about Benton and the residence of decedent, that it is not what would be called a populous community in the law controlling this subject. It also seems preposterous to say that as many as 125 persons a day in a community like this would travel back and forth on the railroad track. It is, however, entirely probable that the few persons who lived near these tracks used them daily, or whenever they wanted to go any place; but so do people all over the State who live near railroad tracks in the country use them as highways. The persons who use these tracks seem to think they have the right to do so, although they cannot help knowing how dangerous it is, and that they take their lives in their hands every time they put foot on a railroad track in the country where many trains are running at high speed and under no general duty to keep a lookout for or give warning to trespassers.

This unlawful use of railroad tracks and premises has caused the death of many persons, and as a consequence great numbers of cases dealing with questions like the one here presented have come before this court. In these cases we have endeavored to lay down some satisfactory rule to distinguish licensees from trespassers, but on account of the varying facts of almost every case it has been found necessary to make distinctions

that are sometimes not easily reconcilable with the principles of law applicable. We think, however, that it has been uniformly ruled under facts substantially similar to those presented in the record that the decedent in this case should be treated as a trespasser.

In Gregory v. L. & N. R. R. Co., 25 Ky. L. R., 1986, this court said: "The fact that footmen sometimes and very frequently used the tracks everywhere cannot be held to give them any right to do so, nor can that fact lessen the right of the company to run its trains over its tracks without taking their possible presence into consideration. The proof in this case shows a state of facts of common existence. Many people in small villages along railways, and those living near the railway, are constantly using the tracks to walk along. There is no way to keep them from it. Appellant's contention that the railway company should run its trains having in view the safety of these trespassers, would be to practically abandon the road to them. If at every curve, bridge, tunnel, cut and fill not plainly in view for a long distance the train would have to slow up, give signals and warnings, and take extraordinary precautions on account of possible trespassers, because other trespassers were in the habit of using the track, it would so retard as to practically destroy the railroad business. On the contrary, it is the duty of these common carriers to serve the public by the diligent use of their tracks and means. Their duties are onerous, and they are necessarily held to a high standard of strict performance in their discharge to the public with whom they must deal. To impose upon them this additional and extraordinary burden of policing their whole line of tracks, or to run their trains so slowly and with such frequent warnings as to guard the safety of trespassers, would be equivalent to turning the right of way into a public highway for footmen. Such a rule would be against the public policy, that considers alike the welfare of the public in securing to it rapid and safe service for the carrier, as well as the preservation of human life. The public, by such unauthorized use, acquires no right to use the railway as a highway."

In Adkins' Admr. v. Big Sandy & Cumberland R. R. Co., 147 Ky., 30, it is said: "The mere use of a railroad track by the public does not convert the users from trespassers into licensees, unless this use is at a place where

,the public have a right to go and be, as, at a public crossing, or the like, or, unless it is in a city, town or populous community where large numbers of people use the track, thereby putting upon the company the duty of anticipating their presence upon the track, and the use of ordinary care to avoid injury to them. It is a fact so well known that we may take knowledge of it that there is not a railroad track in the State that is not used in more or less degree by the public. Persons are continually walking on railroad tracks in all parts of the country. Railroad companies are not required to police their tracks for the purpose of keeping off these intruders, nor are they to be held as consenting to its use because they do not take some police measure to prevent it. Railroad companies are entitled to the exclusive use of their tracks and private property at places where the public have no right to go; and when a person having no business with the railroad company goes upon its tracks or private property, he is a trespasser and takes things just as he finds them. The company is not required to keep its tracks or trains in order for the convenience or safety of trespassers. It owes them no duty whatever except the humane one of saving them if it can be done by ordinary care after it has discovered they are in danger. If, under the facts stated in the petition, Adkins could be treated as a licensee entitled to the protection afforded licensees, then every person who went upon a railroad at any place in the State would be a licensee.''

In speaking of the duty owing by a railroad company at places on its tracks where the habitual use by the public was sufficient to put upon the company the duty of anticipating their presence upon the track, this court said, in C. & O. Ry. Co. v. Nipp's Admx., 125 Ky., 49: ''But the operation of this rule has been confined to cities and thickly populated communities, and has not been, and will not be, extended to rural communities or sparsely settled regions, although footpaths crossing the track and the right of way may be used by a large number of persons each day. In the country districts traversed by lines of railway, it is no uncommon thing for numbers of persons in going to public places, such as school houses, churches, stores, and the like, to use paths or ways that cross the railroad tracks, but that are not private or farming crossings, and also to travel

upon the right of way and tracks of the company. It may be also conceded that these persons use the right of way and tracks of the company with its acquiescence, in the sense that it does not interfere with their use, or take steps to prevent it; but this use by individuals of the tracks and right of way of railroad companies in places of this character does not convert them from trespassers into licensees. Nor does it impose upon the company any duty of lookout or warning. Persons who thus use the tracks and the right of way do so at their peril. They are trespassing upon dangerous premises, and assume the risk of any accident that may befall them by passing trains.''

The rule laid down in these cases has been followed a number of times, and we think it entirely applicable to the facts of this case. Our attention, however, is called to the case of Corder's Admr. v. C., N. O. & T. P. Ry. Co., 155 Ky., 536, in which it is said the court modified the views announced in the Nipp case; but we do not think so. In that case the court, speaking of the Nipp case, said that it was not ''intended to say that railroad companies owe to city residents any greater degree of care than they do to those who reside in other sections. It is not so much whether the accident occurs in the city or village as it is that there was evidence of such long and continued use of the foot path by a large number of people as to impose upon the railroad the duty of giving warning of the approach of its trains to this point. The fact that the accident did not occur in an incorporated city or town cannot of itself affect the case. It is the nature and use of the crossing by the public that is to determine the applicability of the rule, which requires the lookout duty.''

The cases of C. & O. Ry. Co. v. Warnock, 150 Ky., 74; Carter v. C. & O. Ry. Co., 150 Ky., 525; C., N. O. & T. P. Ry. Co. v. Blankenship, 157 Ky., 699, are also referred to, but there is really no conflict between the Corder, Warnock, Carter and Blankenship cases and the Gregory, Nipp, Adkins and other like cases. Running through all these opinions will be found the thought that it is the habitual use of the track by large numbers of persons rather than the location of the track that creates the distinction between trespassers and licensees. It is, however, manifest that there could rarely arise in a sparsely settled region, or out in the country, such use

of the tracks as would put upon the company the duty of anticipating the presence of persons upon them, because, with few exceptions, it is only in cities and towns and populous communities that the tracks are used by a sufficient number of people to impress them with the character of licensees. It should also be noticed that in the Corder, Warnock, Carter and Blankenship cases the accidents considered by the court occurred at or near a railroad station or in the limits of a city, and also at places where large numbers of persons habitually used the track. In this case the accident happened in the country at a place and under surroundings that bring it clearly within the rule announced in the Gregory, Nipp and Adkins cases, and the judgment is affirmed.