## Louisville & Nashville Railroad Company v. Cornelius, et al.

(Decided June 1, 1915.)

### Appeal from Logan Circuit Court.

1. Easements—Acquisition by Prescription.—The continuous and uninterrupted enjoyment of an easement or other incorporeal hereditament for fifteen years, under a claim of right, will create a presumption of a grant, and ripen title thereto by prescription; but evidence showing that the use was permissive will rebut the adverse character of the user, the burden in this respect being on the owner of the servient estate.

2. Easements—Permissive Use.—A permissive use, however long continued, will not ripen into a prescriptive title; and a use permissive in its inception continues to be such until the distinct and positive assertion of a claim of right, brought home to the owner of the servient estate.

3. Easements—Rights Over Railway.—If it be shown that no grant was made or that it is very improbable that a grant was ever made, the presumption will not arise, and especially is this true of railroad rights of way.

WILBUR F. BROWDER, BENJAMIN D. WARFIELD, C. H. MOORMAN and BROWDER & BROWNING for appellant.

S. R. CREWDSON for appellees.

OPINION OF THE COURT BY JUDGE HANNAH—Reversing.

The city of Russellville is served by the Louisville & Nashville Railroad Company, the Memphis Line Division of that system, and the Owensboro & Nashville Division intersecting at that point.

In the latter part of 1911, the Russellville Commercial Club entered into negotiations with the railroad company with a view to inducing it to erect a modern passenger station at the junction of its two divisions, in lieu of the station building which it was then using, and which was thought by the Commercial Club not in keep-

ing with the character of the city for which it was being used.

These negotiations resulted in an offer upon the part of the railroad company to erect a station which would be a credit to the city, upon condition that the city and its Commercial Club would arrange to have discontinued three crossings near the site of the proposed improvement.

One of these was a public highway, known as the Hopkinsville road, or Center street as extended. This crossing was closed by the construction of a new street about three hundred yards to the south thereof, and is not involved in this case.

The other two were private crossings. The right to close one of these was acquired by purchase, and the right to close the other is the subject of this litigation. The railroad company sought to close it by fencing, which the appellees removed, and the company then brought this suit to enjoin them. Having lost in the lower court, it appeals. This crossing is about eight hundred feet from the junction of the two lines and between the old and the new depot, and appellant has three tracks at this point.

The O. & N. division of appellant company runs north and south in the northwestern part of Russellville, where it intersects with the Memphis Line division, which runs almost east and west.

The land lying to the east of the O. & N. division, and on both the north and south sides of the Memphis Line division at this intersection was owned formerly by one Nimrod Long. He had, in 1860, conveyed to the railroad company a 66-foot right-of-way for the Memphis Line, without reserving any crossing rights in his conveyance.

In 1874 Long conveyed to his son-in-law, Capt. J. B. Briggs, in trust for Mrs. Briggs, who was a daughter of Long, a part of the land owned by him on the north side of the Memphis Line. He retained, however, on the north side of the Memphis Line, a strip lying to the west of that part conveyed to Mrs. Briggs, and between the part conveyed to her and what is now the location of the O. & N. Division of appellant railroad.

This later passed to Mrs. Mary L. Hall, the other daughter of Nimrod Long. It seems that upon this tract there was once a house; and on the south side of

the Memphis Line, in front of this old house site, and extending south across the lands owned by Long, to the Hopkinsville road, by which his lands were bounded on the south, there was an "avenue of cedars." A crossing over the railroad track enabled passage from this avenue to the Hall tract. A gate connected the avenue with the Hopkinsville road.

The tract owned by Long, south of the Memphis Line and between it and the Hopkinsville road, was commonly known as the "Briggs Meadow," on account of the fact that Capt. Briggs pastured therein a herd of fine Jersey cattle.

Capt. Briggs built a house on the land, which was conveyed to Mrs. Briggs, about 1872, and lived there until his death in 1905, after which his widow occupied it until 1908. After her death it was sold by her heirs to the appellee, Mrs. Cornelius, in 1910.

Almost directly south of the Briggs residence, across the Briggs Meadow, there is now a street known as Bethel street, running north and south, connected with Center street (or the Hopkinsville road), which runs east and west, and which, as said before, bounds the Briggs Meadow on the south. In the south fence of the meadow (and north line of the road or Center street), and directly opposite Bethel street—that is, at the north end thereof—there was a gate opening into the meadow, thus making two gates from the Hopkinsville road into this meadow, the other one being a little further to the west, at the entrance to the cedar avenue.

There was also a gate opening into this meadow, in the north fence thereof (the south line of the Memphis Line right-of-way), immediately in front of Capt. Briggs' residence across the track therefrom, and on the side of the right-of-way next to the residence, there was also a gate in front of the residence, in the north fence of the right-of-way. There was no regular crossing over the tracks at this point, however, equipped with crossing planks, ballasts, etc., as there was at the point further west, where the road, which extended north between the two rows of cedars, passed over the tracks on to the Hall tract.

Now, the appellee, Mrs. Cornelius, contends that Capt. Briggs, or rather Mrs. Briggs (for she was the owner of the Briggs place), ripened a prescriptive title to a passway over the appellant's tracks immediately in

front of the residence; and evidence has been produced tending to show that Capt. Briggs and his family used to pass over the tracks immediately in front of the Briggs residence, through the gate in the meadow fence, across the meadow to the gate at the end of Bethel street in the meadow fence, at the Hopkinsville road, or Center street, and from thence to the main part of the town.

But the overwhelming weight of the evidence establishes the fact that the Briggs family, in going to the Hopkinsville road and thence to town, almost exclusively used the crossing in front of the Hall place and through the cedar avenue and the gate at the end thereof, especially when using vehicles. This is shown to the preclusion of a reasonable doubt by members of the family and by old family servants, all of whom were thoroughly acquainted with the facts, to have been the custom up until about the year 1909.

It appears that prior to that time the Long tract, or "Briggs Meadow," lying on the south side of the Memphis Line and between it and the Hopkinsville road, of Center street, was divided between Mrs. Hall and Mrs. Briggs, and the partition line was the west line of Bethel street, extended through the meadow to an intersection with the south line of the right-of-way of appellant company, directly opposite to and in front of the Briggs residence. Thus Mrs. Hall became the owner of the land lying both north and south of the Memphis Line and immediately to the east of the O. & N. Division, including the cedar avenue outlet, and on that part of this tract lying south of the Memphis Line and in the southeast corner of the intersection of the two lines of railway is situated the new passenger station of appellant company.

She had sold the tract lying south of the Memphis Line, the cedar avenue tract, in 1907, to one McLaughlin, reserving the passway thereover, from the crossing over the tracks across and out to the Hopkinsville road; and the erection of the passenger station on this tract, which the railroad company bought from McLaughlin, made necessary the acquisition of the passway right reserved by Mrs. Hall. This is the private passway which was acquired by purchase from Mrs. Hall and this extinguished this passway.

It now remains to explain why it was that there were three crossings to be abolished as a condition of the erection of this new passenger station. In 1909 Mrs. Briggs, by deed, dedicated to the city of Russellville a strip of land 60 feet wide, along the line between her and the Hall or McLaughlin tract, which line was the west line of Bethel street extended north to the railroad right-of-way; in other words, she dedicated an extension of Bethel street from Center street, through her part of the "Briggs Meadow," to the railroad property, so that the north end of the street was thereby extended to the line of appellant's right-of-way at a point immediately across the tracks from the Briggs residence.

This street was never improved in any manner, but it seems that appellee, after her purchase of the Briggs property on the north side of the railroad, made use of this street by crossing the track immediately in front of her property, instead of using the Hall crossing, as had formerly been done, and came out to Center street over this extended Bethel street; and was claiming the right so to do when this new passenger station project developed, although the record fails to show that the conveyance from Mrs. Briggs to appellee purports to grant any such appurtenance.

In an effort to settle the question concerning this crossing, members of the Commercial Club conferred with appellee's husband, supposing him to be the owner of the property, when, in fact, it was his wife's.

By the extinguishment of the "cedar-avenue" crossing, the Hall land would be left with no outlet, and it had been made a condition of that transaction that an outlet should be provided for the Hall place. If it had been the purpose to permit the Cornelius crossing to remain open, the obvious outlet for the Hall place would have been, of course, over that crossing.

But having a purpose to close the Cornelius crossing, certain negotiations with Cornelius were had, which resulted in an agreement upon the part of the city and Commercial Club to construct a street north of the railroad, beginning at the east line of the Hall place, and extending across the Cornelius property in front of the Cornelius residence, and thence easterly over the Cornelius lands and the lands of one Roberts, to Main street, the same to be located in such manner that the

Cornelius property could be sub-divided into lots facing on both sides of this street; and this road was built by Cornelius himself under contract with and at the expense of the city, and involved an outlay of approximately one thousand dollars.

The evidence is conflicting as to whether Cornelius agreed to a closing of the crossing in front of the Cornelius residence, in consideration of the construction of this new street, called Cornelius avenue; and we find it unnecessary to consider the effect of such an agreement, if such was made by him, when, in fact, his wife was the owner of the property.

Suffice it to say that despite the construction of this new street, appellee continued to claim the right to the crossing in front of her residence, and this action was necessary to obtain an adjudication thereof.

Aside from the fact that the Briggs family usually crossed the railway tracks at the Hall crossing, rather than in front of their residence, it was shown, by uncontroverted evidence, that such use as was made of a crossing in front of the Briggs residence was a permissive use.

It was shown by Mr. B. M. Starks, who is now general manager of the appellant company, that in 1886 he was train dispatcher of the O. & N. Division at Russellville; that W. N. Newbold was then superintendent of the O. & N. Division, and O. M. Dunn was superintendent of the Memphis Line Division, having his office at Memphis; that Capt. Briggs came into the office of the witness, and while they were conversing in regard to the noise made by whistling and switching of trains in front of the Briggs residence at night, Superintendent Newbold came in; that Capt. Briggs asked Newbold if he had seen Superintendent Dunn, who had just recently been appointed; that Newbold said he was well acquainted with Dunn, but had not seen him since his appointment to be superintendent of the Memphis Line Division; that Capt. Briggs then stated that he had been trying to get Mr. Colcamp, the former superintendent of the Memphis Line, to let him put in a gate in front of his residence leading over into the meadow, but had been unable to obtain the desired permission; that Capt. Briggs then requested Newbold, as he was acquainted with Dunn, to speak to him about the matter when opportunity presented, which Dunn promised to do; that

about two weeks later Superintendent Dunn was at Russellville in the office of the witness when Newbold came in, and that during the course of their conversation Newbold spoke to Dunn about the Capt. Briggs matter; that Dunn said he was not familiar with the location, and tried to avoid all private passway arrangements, but that as trains under Newbold's management used the track there as frequently as those under his own management, he was willing that Newbold should make such arrangement about the matter as he desired.

The witness further stated that during these conversations reference was made by Newbold to the fact that Capt. Briggs was in some way related to Mr. Extein Norton, then president of the Louisville & Nashville Roalroad Company, Newbold stating to Dunn that he felt sure Mr. Norton would appreciate any favors shown to Capt. Briggs; that a short time after that Capt. Briggs put in the gates, and the witness issued orders to the train crews to keep the trains "cut" at that point.

Much stress has been laid by appellee on the fact, apparently impartially admitted by witnesses on both sides of this controversy, that upon the request of Capt. Briggs the train crews would always open up a space in front of the Briggs residence by "cutting the train" or shifting the cars. He kept his Jersey cattle over in the Briggs meadow, while his stable was on the same side of the tracks as his residence, and it was quite a convenience to him to take them directly across at that place. But aside from the fact that it was shown by Starks that he gave orders to this effect, we do not think the fact that the train crew granted these requests made by Capt. Briggs materially strengthens the claim of appellee to the ripening of title to an easement by prescription. There is no evidence to show that these requests were made to any officer of the company upon the basis of a claim of right. They were rather demands upon subordinates that they obey the orders given them by their superior. Nor would the granting of such requests by trainmen bind the corporation or estop it from a denial that such claim of right was recognized. Having been granted permission by the superintendent to use the tracks at that point, it was only natural that Capt. Briggs should object to anyone inferior in authority to that officer, who might attempt to nullify such permission.

1. The rule in Kentucky is that the continuous and uninterrupted enjoyment of an easement or other incorporeal hereditament for a period of fifteen years, under a claim of right, raises a presumption that a grant was made, commensurate with the user, and that the instrument has been lost. Wilkins v. Barnes, 79 Ky., 323; Riley v. Buchanan, 76 S. W., 527, 25 R., 863, 63 L. R. A., 642; Bright v. Dunn, 15 S. W., 7, 12 R., 689; McPherson v. Thompson, 89 S. W., 195, 28 R., 266. But the adverse character of the enjoyment may be rebutted by evidence showing that the user was merely permissive, the burden being on the owner of the servient estate. Lisle v. Embry, 42 S. W., 98, 19 R., 867; Newcome v. Crews, 98 Ky., 339; Patterson v. Griffith, 62 S. W., 884, 23 R., 334; Bowen v. Cooper, 66 S. W., 601, 23 R., 2065; Magruder v. Potter, 77 S. W., 919, 25 R., 1336; Schwer v. Martin, 97 S. W., 12, 29 R., 1221, 7 L. R. A. (N. S.), 614; Smith v. Pennington, 122 Ky., 355, 28 R., 1282, 91 S. W., 370, 8 L. R. A. (N. S.), 149; Vance v. Adams, 112 S. W., 927; Byars v. Rash, 100 S. W., 306, 30 R., 1153.

But the mere permissive enjoyment of an easement, however long continued, will never ripen into title by prescription. Conyers v. Scott, 94 Ky., 123, 21 S. W., 530, 14 R., 784; Harris v. Ash, 24 S. W., 868, 15 R., 679; Boyd v. Morris, 106 S. W., 867, 32 R., 642; and where the user of an easement is permissive in its inception, it continues to be a permissive use until the distinct and positive assertion of a claim of right is brought home to the owner of the servient estate. Patterson v. Griffith, *supra;* Fightmaster v. Taylor, 147 Ky., 469, 144 S. W., 381.

Nor will a presumption of a lost grant arise where the circumstances are such as do not comport with the supposition that a grant was made. "The whole theory of prescription depends upon the presumption of a grant having been made. If, therefore, it can be shown to be a very improbable thing that a grant was ever made, the presumption cannot arise, and the title by prescription fails." Thompson v. L. & N., 110 Ky., 973. And especially is this true of railway rights-of-way. "There is necessarily a distinction between a railroad right-of-way and the property of a private person as to the presumption of a grant. When a railroad has taken a right-of-way, either by condemnation or by pur-

chase, on·the ground that it is necessary for the business of the road, it is not to be presumed that it has granted to others property that was required for public purposes.'' L. & N. v. Hagan, 141 Ky., 20, 131 S. W., 1018.

In the instant case, the passway in controversy was situated between the junction of the two divisions of appellant's railroad and its former passenger station, and at a place where three tracks were required and used for the transaction of the company's business. It is hardly conceivable that the railroad company would grant an easement over its tracks at such a place.

Moreover, the uncontroverted evidence shows that whatever use may have been made by the Briggs family of the crossing in front of their residence, was an enjoyment which had its origin in the express permission of an officer of the railway company possessed of authority to give such permission; and, having in its inception been impressed with such permissive quality, the user continued to be permissive until there was a disclaimer of such quality and the assertion of a claim of right, brought home to the corporate owner of the servient estate. There is no such disclaimer here shown, nor any such assertion of a claim of right brought home to the corporation as would operate to transform a permissive use into one exercised under such claim of right as would ripen into title by prescription.

Wherefore, the judgment is reversed, with directions to enter a judgment enjoining·appellee from interfering with appellant in closing the passway in controversy.