## Louisville & N. R. Co. v. Davidson's Adm'r.

(Decided Nov. 29, 1932.)

ASHBY M. WARREN, H. T. LIVELY, J. P. HAMILTON, CRAFT & STANFILL, and C. S. LANDRUM for appellant.

J. T. BOWLING, F. V. FAULKNER, and FAULKNER & FAULKNER for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER— Reversing.

In the latter part of August, 1929, Manuel Davidson was struck and killed by a train operated by the Louisville & Nashville Railroad Company. His administrator instituted this action in the Perry circuit court seeking to recover damages for his death, alleging that it was caused by the negligence of the company's servants in the operation of its train.

By answer, the defendant controverted the allegations of the petition and, as a bar to right of recovery, affirmatively pleaded contributory negligence upon the part of deceased.

The issues were completed by a reply controverting the affirmative allegations of the answer. Trial by jury resulted in a verdict and judgment in the sum of $7,500 for plaintiff, and defendant has appealed. While a number of grounds for reversal are relied on by counsel for appellant, their brief, in the main, is devoted to argument that appellant's motion for a peremptory instruction in its favor should have been sustained because the evidence discloses that Davidson was a trespasser and appellant owed him no precautionary duties, and further that the instructions given to the jury are erroneous. Necessarily, these grounds call for a consideration of the proof bearing on the question of the use of appellant's tracks and right of way at and near the point of the accident by pedestrians and also as to the facts and circumstances attending the accident.

The accident occurred about a mile from Krypton, between Krypton and Napfor, both railroad stations and the latter near the mining camp of the Lincoln Coal Company. The railroad is double-tracked between the two villages and runs between the north fork of the Kentucky river and the river bluffs, and at some points along the way it had been necessary to blast out the rock bluffs in order to secure sufficient width for the right of way. Between these points and for some distance beyond the scene of the accident, there is a considerable curve in the tracks, the outer or convex side of which is toward the bluffs. At the point of the accident the curve of the tracks is about 7 per cent. The track next to the river is known as the north-bound track and the other as the south-bound track. The train which struck Davidson was on the south-bound track, and at the time, a very long freight train was passing over the north-bound track. By reason of the curve of the track, the north-bound train so interfered with the view of the fireman and engineer of the south-bound train that they could not see the tracks for any considerable distance ahead.

On the afternoon of the accident, deceased had left his home at Krypton and had gone to the offices of the Lincoln Coal Company at Napfor to receive his wages as their employee. On his return, he was walking on the south-bound track meeting the train which struck him. So far as the record discloses there were only two persons who actually witnessed the accident. One of these was John Hartbarger, who lived with Davidson at Krypton and was his fellow employee at the Lincoln Coal Company's mines, and the other, Corbett Edwards, fireman on the locomotive which struck Davidson. Hartbarger testified that he and Davidson had gone to Napfor to draw their pay and on returning, Davidson started ahead, walking down the tracks; that he was attempting to overtake him and, to effect that purpose, caught a freight going toward Krypton. On nearing the point of the accident, he saw Davidson walking between the rails of the south-bound track with his head down as though in deep thought. He gave the following description of what then occurred:

"His back was to me and the north bound train going to Krypton and that drag came around the curve and he raised his head up and made a jump to jump between the two tracks and he was in the

air to jump off to the right hand rail and as turned to jump the engine struck him and he then came back in my sight and turned clear over and landed there on the track.''

The ''drag'' referred to by witness was the train composed of the locomotive, three or four cars, and a caboose.

Corbett Edwards, the fireman, testified that he was on the left side of the cab, and when Davidson came into his view he was 40 or 50 feet in front of the engine, walking on the track meeting the train, but had his head turned looking back; that when he discovered him, he at once called to the engineer, who immediately grabbed the whistle and set the brakes; and that nothing more could have been done to stop the train.

A. G. Spoonamore, the engineer, testified that he was in his customary place on the right-hand side of the cab, looking ahead, but on account of the curve in the track and the length of the engine, his view of the track was completely obstructed; that the fireman saw the man on the track about two car lengths (approximately 60 feet) from the engine, and called out, ''Blow your whistle, there is a man on the track,'' and that he immediately caught the whistle and brake valve; that in applying the brakes, the steam was automatically shut off; and that nothing more could have been done to stop the train.

A number of witnesses were asked about the speed of the train, the distance it traveled after striking Davidson, and as to the signals given. Their evidence indicates that the train was traveling at a speed of 25 to 30 miles per hour and that it continued on from 300 to 800 feet after the accident before coming to a stop; that the alarm whistle sounding immediately before the train struck Davidson was the only signal given after it passed the old pump station several hundred feet back.

The greater portion of the evidence bears on the use by the public of the railroad company's tracks and right of way between Krypton and Napfor. While the population of these villages is not given, it is shown that there are twenty-eight houses in Krypton and twelve in Napfor, including both residences and business houses, and between these points and within sight of the railroad on that side of the river are six or eight houses, including at least four section houses, belong-

ing to the railroad company. The mining camp of the Lincoln Coal Company is near Napfor, but the number of people residing in the camp is not given. There are about three creeks or branches in the vicinity of these villages and on the same side of the river, and the evidence shows that a number of families live along these streams. They are mostly engaged in farming but also work in the mines. There is a public highway on the opposite side of the river which may be reached by a bridge at Napfor, but there is no bridge across the river at Krypton.

As to the use of the tracks by pedestrians, various witnesses testified that they were used by "19 or 20," "15 to 25," "25 to 50," and one gave as his estimate 150 persons, but modified his statement by saying that he referred to trips, as many would use it both ways on the same day. Others, in testifying as to using the tracks themselves, stated that they would see other persons using them, and some testified that they would see persons walking along the tracks every hour in the day. There is also evidence that the people who lived on the creeks and branches would come down to and walk the tracks in going to Krypton or Napfor; that people going to church and baseball games and sometimes school children used the railroad tracks. Many witnesses, in describing the use, employed such terms as "numbers," "a lot," "many," "people generally," etc. There is also evidence that people had been seen to ride horses and bicycles along the right of way.

Counsel for appellee lay great stress on some evidence to the effect that prior to the construction of the railroad, the public used as a passway the space between the river and bluff and which is now the railroad right of way, and that such use continued after the railroad was built.

Continuous and uninterrupted use of a passway over private property for 15 years or more raises the presumption of a grant and casts upon the owner of the servient estate the burden of showing the use was other than as a matter of right. L. & N. Ry. Co. v. Cornelius, 165 Ky. 132, 176 S. W. 964, and cases therein cited. But it has been held by this court in a number of cases that there is necessarily a distinction between private property and railroad right of way, since one is held for private and the other for public purposes; and that

when a railroad acquires right of way by condemnation or purchase, it will not be presumed that it has granted to others property required for public purposes. L. & N. Ry. Co. v. Cornelius, supra; L. & N. Ry. Co. v. Hagan, 141 Ky. 20, 131 S. W. 1018, 35 L. R. A. (N. S.) 189; L. & N. Ry. Co. v. Childers & Only, 155 Ky. 652, 160 S. W. 260, 48 L. R. A. (N. S.) 903; C. & O. Ry. Co. v. Perkins (Ky.) 47 S. W. 259, 20 Ky. Law Rep. 608; Thompson v. L. & N. Ry. Co., 110 Ky. 973, 63 S. W. 42, 23 Ky. Law Rep. 476. In the latter case, the appellant was making claim to a passway along the railroad right of way on the ground that he and those under whom he claimed had used it for over 40 years without objection or question, but it was held that there was no presumption of a grant. "A grant of a right of way to a railroad over a particular tract of land necessarily excludes its use for any other purpose." Ford v. Commonwealth, 156 Ky. 428, 160 S. W. 1080, 1081.

The evidence is not sufficient to raise a presumption of a grant to the use of a passway along the right of way in question either before or since it was acquired by appellant, or to show that the public has a prescriptive right to its use for such purpose.

Davidson was not killed at a public crossing nor in a city or town. The scene of the accident is more than half a mile from the small village of Krypton and considerably farther from the still smaller village of Napfor. There are a few scattering residences near or on the railroad right of way between the villages, and most if not all these are section houses used by employees of the railroad. There are a number of families living on farms along creeks and branches that run into the river near these villages. The evidence falls far short of showing this to be a populous community, but, on the contrary, clearly indicates that it is such as is generally regarded by authorities as a sparsely settled rural district.

There are numerous cases in this state indicating that the evidence here is not sufficient to show such use of the railroad tracks at the place where the accident occurred as would impose upon appellant's servants, in the operation of its trains, the duty of anticipating the presence of persons on the tracks or of keeping a lookout for them. C., N. O. & T. P. Ry. Co. v. Brown, 192 Ky. 724, 234 S. W. 455; Willis' Adm'x v. L. & N. Ry.

Co., 164 Ky. 124, 175 S. W. 18; Sizemore's Adm'r v. L. & E. Ry. Co., 169 Ky. 497, 184 S. W. 383; Cornett's Adm'r v. L. & N. Ry. Co., 181 Ky. 132, 203 S. W. 1054; Lawson v. L. & N. Ry. Co., 213 Ky. 767, 281 S. W. 994; C. & O. Ry. Co. v. McMath's Adm'r, 198 Ky. 390, 248 S. W. 1051; Howard v. I. C. Ry. Co., 189 Ky. 60, 224 S. W. 635; L. & N. Ry. Co. v. Stidham's Adm'x, 194 Ky. 220, 238 S. W. 756. In the latter case there was evidence that a great many people used the tracks night and day, one witness estimating the number using the tracks daily to be from 100 to 150. In the Howard Case, the injured child lived near the corporate limits of a town having a population of about 200. It was shown that school children, both white and black, were in the habit of using the tracks in going to and from school in the town; and had been so using it for many years. In the Lawson Case there was evidence that 50 to 100 persons used the path where the injury occurred. In the McMath Case it was shown that about 75 trips each day were made by persons along the track. In the case of the C., N. O. & T. P. Ry. Co. v. Brown, supra, the accident occurred in a town having from 200 to 300 inhabitants and the evidence indicated that the tracks were used by about 120 persons daily. In all these and in the other cases cited, it was held that the evidence did not show use of the tracks by such numbers as would charge the railroad with the duty of anticipating the presence of persons upon its tracks, and these are typical of a multitude of cases equally in point here.

Applying the authorities cited to the proven facts and circumstances in this case, it is apparent, and we must hold, that appellant did not owe a lookout or other duty to persons using tracks at the point in question except to exercise the care required by law to avoid injuring them after their presence or peril is discovered. From this necessarily it follows that the instructions imposing upon those operating the train a duty other than indicated are erroneous.

There is merit in other question argued, but since the judgment must be reversed, because of the indicated error in instructions, those questions are specifically reserved.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.