## Chesapeake & O. Ry. Co. et al. v. Cole.

Jan. 19, 1940.

382

LeWright Browning and Combs & Combs for appellants.

Howard & Mayo, and Hannah, VanSant & McKenzie for appellee.

OPINION OF THE COURT BY JUDGE TILFORD—Reversing.

Complaining that the jury should have been peremptorily instructed to find a verdict in their favor, appellants prosecute this appeal from a judgment against them for $10,000 awarded the administratrix of T. J. Cole for his death which resulted from injuries received on the night of February 7, 1936, while using a pathway over a railroad track in front of his home in the community known as "Melvin" in Floyd County, Kentucky. The train which struck him consisted of an engine and caboose eastbound from Martin to Weeksbury, to which latter point it was en route to pick up loaded cars. The appellant, Davis, was the engineer, and the appellant, Hayes, the fireman. The Cole residence was situated on the south side of the track and the front yard abutted on the Railroad Company's right-of-way. Approximately forty feet north and paralleling the track was the public highway, to reach which, residents of the community living south of the track were accustomed to cross the track by means of foot paths, one of which was the pathway referred to. Four hundred and five and one-half feet east of the Cole residence is a public crossing of the highway over the Railroad Company's right of way, and a "whistling post," at which eastbound trains are required to signal their approach, is located seven hundred and thirty-six and one-half feet west of the public crossing.

Testimony was introduced to the effect that Cole and others, in crossing the track at the point where he was injured, were accustomed to rely on the signals for the public crossing, and that the train which struck

him failed to whistle or otherwise signal its approach. Failure to give the required signal was denied by the trainmen, who testified, not only that the whistle was sounded when the train reached the "whistling post," but that the automatic bell ringer was set in motion and continued to operate until after Cole had been struck. He was first seen by the engineer as the engine rounded a curve some distance away and at that time was seven to nine feet north of the track and visible only from the waist up because of the depth of the ditch between the highway and the track in which he was moving or standing. The first warning that the engineer had that Cole was in danger was when the fireman called to him "hold it," whereupon he immediately applied the emergency brakes, turned on the sand, and reversed the engine, thus doing everything possible to stop the train. The fireman testified that he first saw the decedent when the engine was sixty or seventy feet distant, and at the time decedent was about eighteen inches from the end of the ties, but that when the engine came within thirty or forty feet of him he suddenly started to run across the track, whereupon the witness called out the warning to the engineer.

According to appellee's theory, based upon foot prints in the snow, Cole did not run in front of the train but walked across the tracks and had cleared the south rail at the time he was struck. Appellants proved by several witnesses that Cole was drunk on the night in question, and it is their theory that his intoxication accounts for his failure to hear or observe the approaching train. But, be this as it may, the testimony leaves no doubt that those in charge of the engine used every possible means to avoid injuring Cole after his peril was discovered. Seemingly, in recognition of this fact, appellee's counsel requested the trial court to instruct the jury upon the right of the user of a private pass way to rely upon the crossing signals required to be given by a train in approaching a nearby public crossing, as enunciated in the case of Cahill v. Cincinnati, etc., R. Co., 92 Ky. 345, 18 S. W. 2, 13 Ky. Law Rep. 714, and this the Court did in the following language:

"The court instructs the jury that if you believe from the evidence that at and prior to the occasion mentioned in the evidence there was a private passway leading from decedent's home to the State Highway, opposite thereto and that said private

passway was in close proximity to the public crossing in the town of Melvin and referred to in the evidence and that it had been customary for the operators of defendant's trains to give signals of their approach to said public crossing at Melvin, and that said custom had prevailed to such an extent that decedent, when using such private passway in going to and from his home, and had reason to rely upon such signals being given for said public crossing; and if you further believe the persons in charge of the train in question failed to give reasonable signals of its approach to said public crossing and by reason of such failure T. J. Cole was struck and killed while using said private crossing leading to his home, if he was so struck and killed, then the law is for the plaintiff and you should so find.

"Unless you so believe you will find for the defendants."

Thus it will be seen that the vital questions for decision are—(1) Whether the place at which decedent was crossing the track at the time he was struck by the train was a private crossing within the meaning of the rule that those rightfully using such a crossing are entitled to rely upon the warnings required and customarily given of the approach of a train to a nearby public crossing; and (2) whether the tracks at the place where the decedent was struck had been used as a crossing by a sufficient number of persons daily for a sufficient length of time to have cast upon the Company the duty of anticipating their presence upon the track and exercising ordinary care to avoid injuring them. If the first question cannot be answered in the affirmative, the instruction given by the Court was erroneous, and the judgment would have to be reversed on that ground; and if neither can be answered in the affirmative, the appellants were entitled to the peremptory instruction requested, since otherwise the decedent was a mere trespasser to whom the Company owed no duty but to exercise ordinary care to avoid injuring him after discovering his peril. Coleman's Adm'r v. Chesapeake & Ohio Railway Company et al., 246 Ky. 29, 54 S. W. (2d) 361.

In determining whether decedent was on a "private crossing" at the time he received his injuries, it becomes necessary to ascertain the meaning of that term. Can the right to cross which the term implies arise out of the

repeated use by one or more individuals of a particular path over a railroad company's right-of-way? If so, anyone, by merely trespassing a sufficient number of times at a point of his own selection, may create a private crossing over a railroad track and shed his garb of trespasser. This Court has expressly held that the right to cross at a given point cannot arise by prescription since a claim based upon prescription assumes a grant and the presumption of a grant is negatived by the public purpose served by a railroad company. Louisville & Nashville Railroad Company v. Hagan, et al., 141 Ky. 20, 131 S. W. 1018, 35 L. R. A., N. S., 189; Louisville & Nashville Railroad Company v. Cornelius, 165 Ky. 132, 176 S. W. 964; Louisville & Nashville Railroad Company v. Davidson's Adm'r, 246 Ky. 231, 54 S. W. (2d) 911. Obviously, therefore, a private crossing within the meaning of the rule announced in the case of Cahill v. Cincinnati Railroad Company, etc., supra, cannot be created except by a contract, express or implied, between the Railroad Company and someone upon whom the right to cross the tracks at a given point is thereby conferred. In speaking of the Cahill case this Court, in the case of Louisville & Nashville Railroad Company v. Elmore's Adm'r, 180 Ky. 733, 203 S. W. 876, 877, said:

"In support of the contention that it was negligence to fail to give the signals complained of, we are referred to the case of Cahill v. Cincinnati, etc., Railway Company, 92 Ky. 345, 18 S. W. 2, 13 Ky. Law Rep. 714, and other cases from this court following it. In that case it was held that one about to use a *private crossing constructed for his benefit under a contract with the railroad company* was entitled to rely upon and have the benefit of signals at a nearby public crossing, which signals had been customarily relied upon by those entitled to use the private crossing, and that a failure to give signals at the public crossing would constitute negligence toward one about to use the private crossing under the circumstances narrated." (Italics ours.)

In the case at bar the private crossing consisted of a foot path from eighteen inches to three feet in width described as follows by Mr. J. A. Hagar, a civil engineer, introduced as a witness by appellee:

"Q. About how far is it from the toe of the fill on that side, that is: On the Cole residence side,

up to the top of the track? A. From the center of the track to the toe of the fill, I would say it is about 20 feet.

"Q. How high is the fill there on the lower side, next to the Cole house? A. It is about five or six feet.

"Q. I will ask you if it isn't about ten feet, or did you measure it? A. I didn't measure it, but I don't believe it is that far.

"Q. It is a narrow, rough path? Isn't it? A. I don't know. It is a path that comes slanting up the Railroad fill.

"Q. Is it very steep there? A. I don't know whether it is so very steep or not. It doesn't come straight up the railroad embankment. It slants.

"Q. It slants for that reason, it is steep and they go up on a slant? A. Yes sir.

"Q. How many feet would you say it is on the surface from the toe of that fill up to the top of the railroad track—I mean the slanting direction it goes upon the surface? A. It is about twelve feet, I guess.

"Q. You didn't measure it? A. I didn't measure it. I have to guess at it.

"Q. And on the upper side of the railroad fill next to the highway, is it about five (5) feet? A. Yes sir, near that.

"Q. That is a steep path also? A. It is a path like the one on the other side. They both slant down the creek.

"Q. They are single file paths, aren't they? A. Yes sir.

"Q. There is no provision for wagons or anything like that to get across the railroad fill? A. There is no constructed crossing, no, sir."

No contract between the Railroad Company and any other person with respect to the alleged crossing was attempted to be shown, and no facts were proven from which such a contract could be implied. The fact that other means of egress had been partially obstructed by high water could not supply the omission, and we are

forced to conclude that decedent at the time he was injured was not using a private crossing within the meaning of the rule announced in the Cahill case, and hence was not entitled to rely on the signals for the public crossing.

Neither can we hold consistently with our former opinions that the tracks at the point where decedent was injured had been sufficiently used by the public to have cast upon the Company the duty of anticipating the presence of persons upon the track and exercising ordinary care to avoid injuring them. One witness introduced by appellee stated that as many as three hundred people used the track at this point on "church days," but that the average number of daily users was thirty or forty. We quote as follows:

"Some days there will (be) two or three hundred, probably, that will travel up and down, and other days there might not be so many. I couldn't hardly tell on an average. An average daily of thirty or forty traveling up and down. Some days there will be two or three hundred traveling up and down on church days.

"Q. Did you say church days? A. Yes, when they have church.

"Q. Do they travel there at all hours of the day and night? A. Yes, they travel at all times of the day and night too.

"Q. Melvin Station is a flag stop? A. Yes sir.

"Q. The train only stops for passengers when it is flagged? A. I think they put off mail there.

"Q. They don't have any building there? A. No, I don't think so."

Various witnesses estimated the population of the community known as Melvin to have been from one hundred and twenty-five to three hundred persons, and the name itself seems to have been applied rather indefinitely to a collection of houses scattered along the railroad and state highway for a distance of about two miles between Wheelwright Junction on the west and Weeksbury on the east. The church was situated on the south side of the track, but "church days" appear to have been rather infrequent. As said in the case of Louisville &

Nashville Railroad Company v. Davidson's Adm'r, supra [246 Ky. 231, 54 S. W. (2d) 913]:

"There are numerous cases in this state indicating that the evidence here is not sufficient to show such use of the railroad tracks at the place where the accident occurred as would impose upon appellant's servants, in the operation of its trains, the duty of anticipating the presence of persons on the tracks or of keeping a lookout for them. C. N. O. & T. P. Railway Company v. Brown, 192 Ky. 724, 234 S. W. 455; Willis' Adm'x v. L. & N. Railroad Company, 164 Ky. 124, 175 S. W. 18; Sizemore's Adm'r v. L. & E. Railway Company, 169 Ky. 497, 184 S. W. 383; Cornett's Adm'r v. Louisville & Nashville Railroad Company, 181 Ky. 132, 203 S. W. 1054; Lawson v. Louisville & Nashville Railroad Company, 213 Ky. 767, 281 S. W. 994; C. & O. Railway Company v. McMath's Adm'r, 198 Ky. 390, 248 S. W. 1051; Howard v. Illinois Central Railroad Company, 189 Ky. 60, 224 S. W. 635; Louisville & Nashville Railroad Company v. Stidham's Adm'x, 194 Ky. 220, 238 S. W. 756. In the latter case there was evidence that a great many people used the tracks night and day, one witness estimating the number using the tracks daily to be from 100 to 150. In the Howard Case, the injured child lived near the corporate limits of a town having a population of about 200. It was shown that school children, both white and black, were in the habit of using the tracks in going to and from school in the town; and had been so using it for many years. In the Lawson Case there was evidence that 50 to 100 persons used the path where the injury occurred. In the McMath Case it was shown that about 75 trips each day were made by persons along the track. In the case of the C. N. O. & T. P. Railway Company v. Brown, supra, the accident occurred in a town having from 200 to 300 inhabitants and the evidence indicated that the tracks were used by about 120 persons daily."

In concluding this opinion it is proper to remark that the Court should not have permitted appellee to prove that several years prior to the fatal accident, Cole had been shot through the leg, while, in his capacity as an officer of the law, he was endeavoring to protect one of the Company's trains. It was, of course, proper to

show that decedent had been crippled as a result of a wound, but the details referred to were obviously such as to prejudice the jury against the Company.

Judgment reversed, with directions to sustain appellant's motion for a peremptory instruction, if renewed at a succeeding trial at which the testimony is substantially the same.