# Louisville & N. R. Co. v. Foust.

(Decided June 24, 1938.)

ASHBY M. WARREN, J. MILLER WHITE, CRAFT & STAN-
FILL and C. S. LANDRUM for appellant.

H. C. JOHNSON and C. A. NOBLE for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

On the afternoon of February 16, 1935, the appellee, Wesley Foust, was struck and seriously injured by one of appellant's trains as he was using its railway track, near the "Old Shepherd" railroad crossing, as a footpath when returning from the post office at Happy, some four hundred feet below, to his home, some half mile above it, at Defiance, Perry County, Kentucky.

Appellee filed suit in the Perry circuit court against the railroad company for damages for his injuries sustained in this collision accident, wherein he recovered judgment against it in the sum of $3,000.

Seeking a reversal of this judgment, this appeal is prosecuted.

The plaintiff, Wesley Foust, by his petition alleged that his injuries were caused by the general gross negligence of appellant's agents and servants in so recklessly operating its train and engine as to run same into and against him, thereby breaking his leg and otherwise seriously injuring him; that he was thereby caused to be confined in the hospital for weeks, to incur hospital and physician's bills, to suffer loss of time, and was permanently disabled, for which he prayed judgment for damages in the sum of $15,000 and $500 for expenses incurred.

Appellant answered, traversing the alleged negligence and setting up the plaintiff's charged contributory negligence in bar of the action. By a further paragraph, it affirmatively pleaded that on April 5, 1935, it made a full and final settlement with the appellee of all claims for damages, suffered by reason of the injuries sustained by him, in consideration of the sum of $150 paid him as an accord and satisfaction thereof.

Plaintiff replied, denying that he was guilty of contributory negligence upon the occasion of his injury, and further charged that the pleaded settlement made with him was procured by the fraud of the appellant's claim agent, Davis, and asked that the $150, pleaded as paid him in settlement of his cause of action, be held for naught, except as a credit on the amount of damages he might be adjudged to recover.

By an amended reply, he alleged that he did not read the release or writing, pleaded as a compromise settlement of his claim for damages made by appellant with him, when he signed same (which he admitted), but that it was read to him by appellant's claim agent, who had then prepared it; but that he did not read the whole of it to him, but, on the contrary, so read it as to mislead him, by concealing its real character, and to practice a fraud upon him, in that he relied upon Davis' having properly read the release; that had he known the true import and effect of the writing, as one providing for a release of his claim against appellant for his injuries sustained, he would not have signed it, but that he had signed it because he thought and believed that the writing, as it was read to him, only provided

for a settlement of his claim for loss of time caused by his injuries sustained.

With his filing of this pleading, appellee tendered back to appellant the $150 so paid him, which appellant declined to accept.

Appellant then filed its rejoinder, traversing the allegations of the reply and reply as amended, and further alleging that appellee did not make proper tender of the money paid him in settlement of his claim, in that he did not tender it prior to or contemporaneously with the institution of his suit for damages.

It is disclosed by the record that this collision accident, in which plaintiff sustained his injuries, occurred near the point known as "Shepherd's Crossing," where the appellant's railroad track, extending along Carr's Fork, Perry County, Kentucky, crosses the Lexington-Jenkins highway.

A number of plaintiff's witnesses live near this crossing and the railroad bridge, which is some 368 feet below the crossing. Near the bridge there is situated the mining camp of the Happy Coal Company, where there is maintained a railroad station, a post office and a company commissary. On the other side of this crossing, about a quarter of a mile above it, is located the Defiance mining settlement, near which the Marlowe Coal Company operates its mine. At the time plaintiff was injured, he was living at Defiance and employed in the Marlowe mines as a "coal shooter."

The testimony of the plaintiff's witnesses, as to the extent and character of the public's use as a passway of this section of the railroad track running between these two mining camps at Happy and Defiance, something like a half mile apart, is that some of the miners' houses were located at Happy and some fifty or more around and above "Shepherd's" crossing, from where they extended on up the railroad track to the camp of the Marlowe Coal Company at Defiance.

The evidence shows that the company's railroad track, which connects these two mining camps, runs through a sparsely settled country, populated by small mining communities grouped here and there along its course; that a majority of those living in these communities get their mail at Happy post office and that a majority of that majority, it is testified, habitually and

daily use the appellant's track, extending between the crossing and Happy, as a footpath in going to and from the post office at Happy for their mail.

No one of these witnesses, however, attempted to state definitely the number or that a large number habitually used this section of the appellant's track as a public passway or what was the extent or daily number of those so using it.

The plaintiff stated that these people usually travelled the railroad track in going to and from "Shepherd's" crossing over to the Happy commissary and post office, because it was a nearer way between such points than was the highway, which runs nearby and parallel with the track between these points. Also he stated that people could be seen "about any time travelling the railroad track," but that he did not know what number so used the track daily.

Another of plaintiff's witnesses stated that he believed there were about ten houses and a store house between the Defiance mining camp and the crossing; that a majority of the people living in them got their mail at Happy and that a majority of that majority used the railroad track most of the time. Also, the plaintiff's witness, Combs, who lives at the Happy camp, and some three or four hundred yards from the railroad crossing, stated that from where he lived, up to and including the Marlowe Camp settlement, there were from fifty to seventy houses; that a majority of their occupants got their mail at Happy; that in going to and from the Happy post office they usually used the highway to the crossing and then followed the railroad track to Happy.

The plaintiff, when testifying, stated that he made his home with his brother at Defiance, where he was employed in the Marlowe Coal Company mines; that on the night before the accident, he had there visited a friend, with whom some liquor drinking was indulged in; that on the following morning, he had taken a drink of liquor before breakfast, after which he had visited a number of his friends living between Defiance and Happy; that he had later gone to the Happy post office for his mail and while there had fallen in with several of his friends, with whom he further indulged in some liquor drinking; that about an hour following this, he left Happy and started for his home some half mile

up the track at Defiance; that as he was walking up the appellant's track in going home, he met his friend, Mitchell Taylor, at the railroad bridge, with whom he talked a moment or two, when he again started along his way over the bridge towards "Shepherd's" crossing and his home, a short distance beyond it.

When asked where he was when he was struck by the appellant's train, and what he last remembered as to the circumstances under which he was so struck and injured by the train when he was but a few feet below "Shepherd's" crossing, he answered:

"The last thing I remember, I was walking along after I left Mitchell Taylor; the wind was coming down the hollow and it was drizzling rain and I pulled my hat down over my face * * * I was on the bridge somewhere."

Further, he stated that he had not heard a bell ring or a whistle sound before he was struck; that when he first found out he had been injured, he was "in the hospital, laying in the bed. I didn't know where I had been, it seemed like I had been asleep somewhere."

When asked if the train had struck him while he was on the bridge, he said: "I wouldn't state what struck me."

Ioma Mohr, a witness for the plaintiff, testified that she saw the appellant's train strike and injure the appellant as he was walking up the track near the crossing; she stated:

"I saw Wesley Foust walking up the railroad track and as I looked out and saw him walking up the track the train came up quick and hit him. * * * It (the train) stopped as it hit him."

No witness, however, undertakes to state how long it was after the plaintiff left the bridge before the accident occurred near the crossing. The plaintiff does not claim to have walked on the railroad track from the bridge to the point where he was struck, nor does any witness undertake to show what distance the plaintiff had walked the track before he was struck, or that he had been walking the track for a sufficient time before he was struck for the train operatives to have discovered his presence there and to have avoided striking him.

It is admitted that plaintiff was seriously injured in this collision accident; that almost immediately after its occurrence (on February 16, 1935) he was carried directly to the hospital at Hazard, where he was treated by Dr. Hagan for his injuries until the following March 7, when his injured leg was put into a cast and he was allowed to go home, after being instructed to return to the hospital from time to time for further treatment and examination of his injuries and broken leg; that on April 3, he returned to the hospital, when the cast was removed from his leg by Dr. Hagan, his attending physician, and he was finally discharged as a patient.

The evidence is further that two days later, on April 5, word having been sent the appellee by one Davis, the claim agent of the appellant company, to come to his office at Hazard and see him in regard to effecting a settlement with him, he went with his friend and witness, Reeves, for a conference with him.

This conference resulted in the parties agreeing upon and their executing a written release or settlement of plaintiff's claim for damages for the injuries he had sustained, and which written release was by appellant obtained in consideration of $150 then and there paid him therefor.

The plaintiff, his witness, Reeves, Davis, the claim agent and his stenographer, who were present at this conference, all testified as to such a release agreement being reached; that the writing, prepared there at the time by the agent evidencing same, provided by its express terms that plaintiff, for the $150 paid him, was making a full compromise settlement of all claims against the company for damages suffered by reason of his injuries received and growing out of this accident. Davis stated that plaintiff read the agreement and that he (Davis) also read it to him, after which plaintiff signed the same, and following his signature thereto, he also signed a further statement certifying that he had read and fully understood the provisions of the release signed by him.

Plaintiff, *when testifying as to this release signed by him,* did not deny that same was properly read to him, or that he himself read the writing, as were both pleaded by appellant and testified by Davis, its claim agent; nor did the plaintiff, when testifying, ever state or claim that the same was improperly read to him, or

that he was deceived by the way in which the agent read same to him, or that he was misled thereby, or that he signed the instrument in ignorance of what were its terms and true import.

Appellee's testimony, on the other hand, given in support of his claim to damages, and in avoidance of the barring effect of his signed release, was only to the effect that *fraudulent misrepresentations were made him by the agent, not in respect to the terms of the written instrument, as pleaded by his reply*, but as to misrepresentations he testified the agent made as to what plaintiff's doctor, who had treated him for his injuries, had stated was his then recovered condition in that the agent had falsely stated to him that he had been informed by the plaintiff's doctor that the plaintiff was then well and could shortly return to work, which statements he had later learned were untrue and by the agent were known to be untrue, and that had he known of their falseness, he would not have signed this writing, which, unknown to him, by its terms effected a compromise settlement of his every claim.

From the above statement of the pleadings and proof, so disclosed by the record, it is evident that this case was prosecuted on the theory that the appellee was a licensee in the use of appellant's track as a pathway upon the occasion of his injury.

At the conclusion of the introduction of plaintiff's evidence, the appellant moved the court to peremptorily instruct the jury to find and return a verdict for it, which motion the court overruled. To this ruling the appellant reserved an exception.

The appellant then introduced Dan R. Davis, its claim agent, as its witness. He testified that upon learning of this injury having befallen the appellee, Wesley Foust, while using appellant's track as a footpath, he called upon him at the hospital and that later, on April 5, two days after his release therefrom, the appellee came to his office at Hazard for the purpose of making a settlement of his claim against the railroad company. He testified that he then told the appellee that he didn't think the company owed him any money, that it might give him a little money to help him along until he went back to work; that their conference resulted in his making a settlement with the appellee, from whom he ob-

tained a written release of his claim for all damages resulting from the injuries sustained by being struck upon the occasion in evidence by one of his company's trains; that this release, at the time prepared by witness, was read to appellee before he signed it and that it was also read by the appellee himself before he signed it; that after he signed it, he paid him $150 by draft in consideration of his executing it.

This release, purporting to be a compromise settlement of appellee's claim to damages arising from his injuries sustained, is as follows:

"Louisville & Nashville Railroad Company.

"To Wesley Foust, Address, Happy, Ky. Paid by draft No. 55432.

"For and in full compromise, settlement, discharge and satisfaction of all claims, demands or causes of action on account of all injuries to the person, including those that may hereafter develop as well as those now apparent, and all damage to and loss of property as a result of the injury sustained while a trespasser, on and along the tracks of the Louisville & Nashville Railroad Company, and when struck by a freight train, near Happy, Kentucky, February 16, 1935, and for all damage sustained.

"In consideration of the payment to me of the sum of One Hundred Fifty & no/100 Dollars ($150.00), I, Wesley Foust, of Happy, in the county of Perry, and State of Kentucky, do hereby release and forever discharge the Louisville & Nashville Railroad Company, and its officers, agents and servants from all suits, actions, causes of actions, claims and demands of every character whatsoever that I now have or may hereafter have, growing out of any and all injuries to person and damage to property in consequence of, or in anywise connected with the above accident.

"In making this settlement, no promise has been made to me of future employment and the amount paid me in this voucher is paid in settlement of my claim as aforesaid, and not as lost time, wages, or otherwise than as aforesaid. And

it is distinctly understood and agreed by me that the sole and only consideration inducing me to execute this release is the payment to me of the sum of money mentioned above.

"Before executing this release I have fully informed myself of its contents, and I execute it with full knowledge thereof, and of my own free will and accord.

"Witness my hand at Hazard, Kentucky, this 5th day of April, 1935.

"Wesley Foust.

"Witness:

"Maude Bailey
"Dan R. Davis.

"I have read the above release and understand it.

"Wesley Foust.''

There was also introduced in evidence the draft for $150, given the appellee in consideration of his release of the appellant for all claims for damages due from his injury. There was written on the face of the draft, which was accepted and cashed by appellee, the following notation as to the consideration for which the draft was given:

"For the injury sustained while a trespasser on and along the tracks of the Louisville & Nashville Railroad Company, and when struck by a freight train, near Happy, Kentucky, February 16, 1935, and for all damages sustained."

Further, the witness testified, with respect to the appellee's making this release of his claim, that he had talked with the appellee at the hospital previously in regard to his injury and had told him he would pay him $150. Further, he denied that at the time of obtaining this release from the appellee that he had told him he had been to the hospital the day before and that the doctor or doctors had told him (Davis) that appellee was in good condition and would be able to work in three weeks. He also denied that he himself had told appellee that he would be able to work in three weeks or that the doctor at the hospital had told him that Foust didn't have any permanent injury. Further, he testified that he didn't tell Foust he would be able

to go to work at any time but that he did give him some money because "he didn't know when he would be able to work." He also denied that he told him he was in good health and in as good a condition as he was before he was injured. He also denied telling him that he didn't then intend to pay him for any damages, but had said that he would give him some money to "help him out" and that he didn't intend to pay him for any injuries received as it was his opinion that he had no claim for damages.

Upon the conclusion of the testimony of this witness, the only one introduced by appellant, it renewed its motion for a directed verdict in its favor, which motion was again overruled, with objections and exceptions saved to the ruling, when the court, upon its own motion, instructed the jury which retired and returned a verdict for the plaintiff in the sum of $3,000, upon which judgment was accordingly entered.

Appellant's motion and grounds for a new trial having been overruled, this appeal is prosecuted, seeking its reversal upon the following grounds:

(1) Appellee was a trespasser to whom no precautionary duties were owing, and whose peril was never discovered.

(2) Appellee was guilty of contributory negligence.

(3) Appellee compromised and released any cause of action which he had.

(4) The verdict of the jury is based on pure speculation and conjecture.

Considering now the first objection urged, that appellee was a trespasser to whom no precautionary duties were owing, and whose peril was never discovered, it is to be noted that this action was prosecuted upon the theory that appellee, at the time he was struck and injured, was using appellant's tracks as a licensee, to whom certain precautionary duties, in such case imposed by law, were owing.

The evidence introduced by plaintiff in support of this theory, or to establish that there was such public use of this section of the appellant's railroad track between "Shepherd's" crossing and the post office at Happy, where appellee was injured, as to convert him

into a licensee, was to the effect, as hereinabove stated, that a majority of the members of this mining community both daily and habitually used this section of the railroad track in going to and from the post office at Happy. No witness testified as to the extent of the public's use of this section of the track as a footpath, or that any definite number daily used the track in such manner or that it was daily and habitually so used by a large number of the public.

Further, the evidence clearly showed that this section of appellant's track, so travelled by the members of this mining community between these two mining camps in evidence, runs through a sparsely settled country community, very much like any other country community traversed by a railroad, upon which some pedestrian, whether a tramp or only a trespasser, may at most any time be seen making use of the track as a footpath.

In the case of Louisville & Nashville Railroad Company v. Stidham's Adm'x, 194 Ky. 220, 238 S. W. 756, it was held that the duty of those operating trains to anticipate the presence of trespassers upon the track and to exercise ordinary care to discover their presence, by maintaining a lookout and giving warning signals, does not arise where it is shown the greatest number of persons using the track, according to the largest estimates of any of the witnesses, was 150 persons each 24 hours, where the place of the accident was in the country or at a point upon the track surrounded by a sparsely settled community.

In there disposing of the question as to whether such use of the track at such place was sufficient to convert the status of the injured user of the track from that of a trespasser into that of a licensee, to whom precautionary duties were owing, we said:

"We have been cited to no case holding that the use of the track by pedestrians to the extent indicated was sufficient to impose upon the operators of trains the duty to anticipate the presence of persons thereon, and to take the required precautionary measures to prevent a collision with them. * * * We have been cited to no case, nor have we been able to find one, which holds that the railroad track in a sparsely settled country, a consid-

erable distance away from any incorporated town, may be converted by the public in general into a public highway so as to require those operating trains to anticipate the presence of persons upon the track and to take the necessary precautions for their protection. On the contrary, the later opinions of this court have followed the doctrine as laid down in the case of Chesapeake & Ohio Railway Company v. Nipp's Adm'x, 125 Ky. 49, 100 S. W. 246, 30 Ky. Law Rep. 1131, saying: 'But the operation of this rule (anticipating the presence of persons on the track) has been confined to cities and thickly populated communities, and has not been, and will not be, extended to rural communities or sparsely settled regions, although footpaths crossing the track and the right of way may be used by a large number of persons each day.'

"In that opinion it is recognized that in country districts traversed by lines of railway it is nothing uncommon for a number of persons going to school houses, churches, stores, and other public places to travel the right of way and upon the railway tracks, even with the acquiescence of the company, in that it takes no affirmative steps to prevent it, yet, it is therein said:

" 'But this use by individuals of the tracks and right of way of railroad companies in places of this character (as stated above) does not convert them from trespassers into licensees. Nor does it impose upon the company any duty of lookout or warning. Persons who thus use the tracks and right of way do so at their peril.' "

Further (page 758), the opinion quotes with approval from the case of Adkins' Adm'r v. Big Sandy & Cumberland Railroad Company, 147 Ky. 30, 143 S. W. 764, as follows:

"The mere use of a railroad track by the public does not convert the users from trespassers into licensees, unless this use is at a place where the public have a right to go and be, as, at a public crossing or the like, or, unless it is in a city, town or populous community where large numbers of people use the track, thereby putting upon the company the duty of anticipating their presence

upon the track, and the use of ordinary care to avoid injury to them.''

To the same point and effect we said in Willis' Adm'x v. Louisville & Nashville Railroad Company, 164 Ky. 124, 175 S. W. 18, in speaking of this precautionary duty owing by the railroad company at places on its track where the habitual use by the public was sufficient to put upon the company the duty of anticipating the presence of persons upon the track and after an extensive review and citation of the decisions of this court (page 23):

> "Running through all these opinions will be found the thought that it is the habitual use of the track by large numbers of persons, rather than the location of the track, that creates the distinction between trespassers and licensees. It is, however, manifest that there could rarely arise in a sparsely settled region, or out in the country, such use of the tracks as would put upon the company the duty of anticipating the presence of persons upon them, because, with few exceptions, it is only in cities and towns and populous communities that the tracks are used by a sufficient number of people to impress them with the character of licensees.''

See, also, to like effect, Chesapeake & Ohio Railroad Company v. McMarth's Adm'r, 198 Ky. 390, 248 S. W. 1051; Cornett's Adm'r v. Louisville & Nashville Railroad Company, 233 Ky. 797, 26 S. W. (2d) 1031.

It is our conclusion that the evidence presented in this case, as to the use made of the appellant's track where appellee was injured, was insufficient to show its daily and habitual use by the public in such large numbers as was required to convert the status of the appellee from a trespasser into that of a licensee, to whom these precautionary duties on the part of those in charge of the train were owing.

By its instruction No. 2, after defining the words "ordinary care" as used in the instruction, the jury was told that:

> "If the railroad track of the defendant between the crossing mentioned in evidence and the mining camp of Happy * * * was *frequently and habitually used by the public* as a footway with the knowledge

and acquiescence of the defendant, and was a place where the presence of persons on the track was to be anticipated, then it was the duty of the defendant's employees in charge of the movement of its trains to keep a lookout for persons using it as a footway to give reasonable signals and warnings of the movement of its cars when approaching said place. * * *'' (Italics ours.)

We are of the opinion that this instruction was prejudicially erroneous in not requiring the jury to believe from the evidence that appellant's track at the point of the accident was not only frequently and habitually used by the public but was so used by it in *large numbers* with the knowledge and acquiescence of the appellant before the precautionary duties of lookout and warning became owing to appellee.

So was it expressly held in the case of Louisville & Nashville Railroad Company v. Hyde's Adm'r, 221 Ky. 39, 297 S. W. 814, wherein, in answer to the criticism of the instruction there as here made, that it did not require the jury to believe as it should have, that the track was daily and habitually used by the public in *large numbers,* we said (page 816):

"It will be observed that this instruction imposed a lookout duty if the use of the track at that place was habitually used without reference to the extent of such use or the number of persons that habitually used it at that place. As was said in Louisville & Nashville Railroad Company v. Banks' Adm'r, 195 Ky. 804, 243 S. W. 1018:

" 'The determining factor in a case of this kind is not habitual use of the track by the public. It may be habitually used by all the public that passed that way, but the number of persons so passing may be very small. Therefore, in order to convert trespassers into licensees, it is necessary that the track be habitually used by the public in such large numbers that the presence of persons on the track should be anticipated.' "

In view of the rule and governing principle announced in these decisions, it is our conclusion that the evidence introduced by plaintiff was insufficient to show that the section of the track where his accident occurred was habitually used by the public in such large

numbers as was effective to convert his status of a trespasser into that of a licensee, requiring those in charge of the train to anticipate the presence of persons at such place upon its track and observe the precautionary duties imposed upon them by reason thereof.

From this it follows, that having failed to establish that appellee was a licensee in the use of appellant's track when injured, to whom precautionary duties were owing, but was a trespasser thereon, whose presence there it was not shown was discovered in time to have avoided injuring him, it follows that his injuries were not shown to have been caused by the negligence of appellant's servants and, therefore, he must be held to have failed to maintain his cause of action.

Such being our view, it is our conclusion that the trial court erred in overruling appellant's motion for a peremptory instruction.

We are further of the opinion that the pleaded release executed by appellee constituted a good defense to appellee's claim for damages, and entitled the appellant to have had given, upon such ground also, a directed verdict in its favor, as moved for at the conclusion of the evidence.

For these errors committed by the trial court, in refusing to sustain appellant's motions for a directed verdict, the judgment should be, and it is reversed.