## Louisville & N. R. Co. v. Adams' Adm'x.

October 22, 1946.

132

C. S. Landrum, J. J. Tye, H. L. Bryant and C. E. Rice, Jr. for appellant.

Oscar W. Black and R. L. Pope for appellee.

OPINION OF THE COURT BY JUDGE DAWSON—Reversing.

This is an appeal from a judgment for $2,000 in favor of appellee for the death of her decedent, James Adams, age 63, whose body was found on appellant's track about two miles North of Corbin.

Deceased was killed some time in the late afternoon of July 5, 1944, and this fact was learned shortly after a North bound passenger train and a South bound freight train had passed. When the South bound freight train reached Corbin there was a hat, a pair of suspenders and blackberry stains on the pilot of the engine. The decedent had left his home the morning of the accident for the purpose of picking blackberries.

Several grounds for reversal are urged, one of which is that the lower court was in error in overruling appellant's motion for a directed verdict which was made at the conclusion of plaintiff's evidence and again at the conclusion of all the evidence.

At the point where the body was found there are three tracks—the South bound main track is on the West side, the North bound main track is on the East side, and a passing track is between the two. The body was found between the South bound main track and the passing track.

There is a public crossing known as the Jones crossing nearly 700 feet North of where the body was found, and another public crossing known as the Whitt crossing nearly 1000 feet South of the location of the body. Between these crossings there are three houses East of the tracks and two houses West of the tracks, all of them near the tracks.

One of appellant's witnesses introduced a map of this general vicinity which is an unincorporated community called Dortha. That map reflects the territory along appellant's tracks for a distance of 4800 feet, approximately 2400 feet in each direction from the place where the body was found. It also covers a distance of 1000 feet East of the tracks and 1200 feet West of the tracks. According to this map there are sixteen houses in this general vicinity, including one church and one vacant store building. There is no post office, store, school or blacksmith shop, but appellee's witnesses say there are three or four churches in this community although only one is located in the territory shown on the map. The people living in this vicinity receive their mail by rural route and there is a public road to the West of the railroad right of way which crosses the tracks at the Whitt crossing. This road is accessible to all of the people of this community, many of whom possess automobiles or trucks.

Appellee's cause of action is based upon the theory that the use of appellant's tracks by the public at the point where decedent was struck is and was such that the decedent was entitled to a lookout and a warning of the approach of trains. It is asserted that this vicinity is a thickly populated community and because the tracks are used by such a large number of people, with the acquiescence of the appellant, and the decedent's presence on the track should have been anticipated and the train should have been under reasonable control so as to prevent injury to anyone so using the tracks, even though the decedent would have otherwise been a trespasser to whom no duty was owed until his peril was discovered. There is no evidence that decedent was seen by any members of the crew of the train or that the accident was discovered until the train reached Corbin.

In order to support the theory outlined above the appellee introduced eight witnesses besides herself. She testified that she had been visiting her children, who had lived in that community for eight or nine years, and had been living near the Whitt crossing for approximately seven months prior to the death of her husband, and was familiar with the public's use of the tracks at this point. She estimates the number of persons using the tracks at 50 to 100, and recalls that on the occasion of a baptizing

in the community she saw 150 persons at one time. She estimates that there are about twenty-five houses in this general vicinity.

Crit Smith said that the largest group of persons he had seen using the tracks was about 30, and there were days when he did not see anyone. This witness said that he had seen the decedent picking blackberries on the day he was killed and that he entered the railroad right of way at the Jones or North crossing and walked down the track toward Corbin, but did not see the accident.

Bob Alsip lives three or four hundred yards from the place where Adams was killed but is at home only on Sundays. He said he had seen as many as eight or ten using the tracks going to and from Corbin.

Mat Adams, son of the decedent, lived in this community in sight of the railroad tracks for about 20 years. He estimates the number of people using the tracks on "meeting days and baptizings," or other special occasions, to be as many as 150. He said that as many as 100 people a day on "lots of days" crossed these tracks, but he does not say that this number used the tracks at the place where the accident occurred.

Irene Hall lives one-half mile from the place where decedent was killed. She says she has seen from 30 to 35 people using the tracks. She also says that a fair average number of people who use the track would be 200 to 250, considering the same person going up and coming back as two people.

Lester Carroll, a son-in-law of decedent, has lived about 150 yards from the place of the accident for about ten years. He says there are from 18 to 25 houses in this general vicinity and that the members of those families use the tracks, except those who have automobiles. He estimates or guesses that around 50 or 60 people use the tracks on church days.

James Moore says he had occasion to observe the use of the railroad tracks by the public and in his opinion from 125 to 150 use the tracks as a walk-way on church days or special occasions.

Virginia Carroll, daughter of decedent, has lived at the Whitt crossing since 1935, and has observed the pub-

lic use of the tracks during that time. She has seen as many as 150 people using these tracks at the time of a revival meeting or other special occasion, and that a fair estimate of the people so using the tracks on other days would be from 50 to 75.

Nancy Smith has lived at Dortha for two years and says there are eight or nine houses in that community. On the day of the accident she saw the decedent enter the right of way at the Jones crossing. He walked down the tracks and when she last saw him he was about 75 yards below her house, and when his body was found it was approximately 150 yards from the place .she last saw him. She says that she has had occasion to observe the tracks and see people using them, and that on some days she would see not over two or three persons, but on church days there would be as many as 15 or 20 at one time.

It may be said here that several of these witnesses stated that while they were in a position to do so, they did not hear either a bell or whistle at the time the South bound freight train passed.

It will be seen from this brief reference to appellee's evidence that there is a wide variance between the evidence of the various witnesses. There is no evidence that can be described as accurate and certain. All of the estimates of the numbers of persons using the tracks are only estimates or guesses and some of them relate to persons using the public crossings, which would have no bearing on the case under consideration since decedent was killed at a point between the two crossings.

In order to uphold the right of action upon the ground relied upon it is necessary that appellee not only show by substantial evidence that the tracks at the place where the accident occurred be used daily by a large number of persons for pedestrian travel, but also that the place of the accident be in either an incorporated area or a thickly settled community.

On examination of the many cases involving this question it will be seen that it is nowhere indicated that the public or any member of it acquires any property right in or to the use of a railroad right of way by an easement or otherwise. On the contrary, it is well settled that no such right can be acquired through persistent

and repeated wrongs. See Louisville & Nashville R. Co. v. Marlow, 169 Ky. 140, 183 S. W. 470, and the authorities cited therein.

The cases upholding a right of action upon this theory are based upon humane reasons, and it is said that where people generally have used a railroad right of way for a considerable length of time in cities and towns, or thickly populated communities, the law raises a presumption that such use of the track is by acquiescence of the company and imposes the duty upon the carrier, while using its tracks at that place, to anticipate the presence of persons so using it and to exercise a corresponding degree of care in approaching such place to keep a lookout to discover the presence of persons on the track, and to exercise such care in the operation of trains as to have them under reasonable control to prevent injury to anyone so using the tracks. Louisville & N. R. R. Co. v. Veach's Adm'r., 129 Ky. 775, 112 S. W. 869; Southern R. Co. v. Sanders, 145 Ky. 679, 141 S. W. 77, and other cases.

In the recent case of Louisville & N. R. Co. v. Bush's Adm'x, 285 Ky. 645, 148 S. W. 1050, 1051, a comparable situation was presented to this court. There the basis of an action under these circumstances is set out as follows:

"All of our prior cases upholding and sustaining the right of action upon the ground relied on by plaintiff not only say that there must be more than one hundred and fifty persons per day who use the track for pedestrian travel, but also that the place must be in a thickly settled community and that the travel must be upon the railroad track, or sufficiently near to it as to expose the traveler to danger from passing trains."

In Louisville & N. R. Co. v. Stidham's Adm'x, 194 Ky. 220, 238 S. W. 756, 757, the place of the accident was in the country, although the track connected two incorporated towns located about three miles apart. In reversing the judgment this court observed:

"We have been cited to no case holding that the use of the track by pedestrians to the extent indicated was sufficient to impose upon the operators of trains the duty to anticipate the presence of persons thereon, and to take the required precautionary measures to prevent

a collision with them. * * * We have been cited to no case, nor have we been able to find one, which holds that the railroad track in a sparsely settled country, a considerable distance away from any incorporated town, may be converted by the public in general into a public highway so as to require those operating trains to anticipate the presence of persons upon the track and to take the necessary precautions for their protection.''

In Sizemore's Adm'r v. Lexington & E. R. Co., 169 Ky. 497, 184 S. W. 383, 384, it appeared that as many as one hundred persons trespassed daily on the track where Sizemore was killed. In that case it is said:

''The rule requiring these precautions upon the part of those operating railroad trains is confined to cities or thickly populated communities, and cannot be extended to rural communities, or sparsely settled places, although the tracks at those places may be used by a large number or persons.''

To the same effect see Henson's Adm'r v. Hines, 193 Ky. 198, 235 S. W. 359; Louisville & N. R. Co. v. Foust, 274 Ky. 435, 118 S. W. 2d 771; Louisville & N. R. Co., v. Arrowood's Adm'r, 280 Ky. 658, 134 S. W. 2d 224, and many other cases.

The many cases relied upon by appellee are not in point since they may be distinguished on the facts involved. In every case cited by appellee the accident occurred either in a city or town or a populous community. The case chiefly relied upon is that of Louisville & N. R. Co. v. Spoonamore's Adm'r, 278 Ky. 673, 129 S. W. 2d 175. Reference to that opinion shows that the accident happened within the corporate limits of Brodhead, and this fact alone brings that case within the rule herein set out. Moreover, it appears from the opinion that two well beaten paths led from the railroad right of way to a swinging bridge across Dix River, and that both were frequently used by inhabitants of Brodhead in going to and from a swimming beach and a spring, and by persons residing East of Dix River in going to and from Brodhead, and that most of the persons using these paths followed the railroad tracks to the business section of the town.

In that case the witnesses who testified show considerable use of the tracks even if that use had been

confined to them alone, but all of them said that while using the tracks themselves they also saw large numbers of people using the tracks in the same manner. That is not the situation in the case under consideration. In the first place, we do not think the evidence shows that the community called Dortha can be said to be a populous community. It is not even claimed that it is an incorporated city or town. Were we disposed to say that the use of the tracks at the place in question is sufficient to place a lookout duty upon the appellant, it would still not follow that the case should have been submitted to the jury since the other element required is not shown.

The reason that the application of this rule is confined to incorporated cities or towns, or thickly populated communities, is that it would be an unjust burden to place upon railroads the duty to treat every person using its tracks in fairly thickly settled country neighborhoods as a licensee. Indeed, if that rule should be applied to the facts in this case, there would be few stretches of track in any populous country neighborhood in the state through which a railroad runs where the railroad would not be required to treat every person using its tracks as a licensee. This would be an unreasonable and unjustified burden which the railroads should not be required to bear. See Howard v. Illinois Central R. Co., 189 Ky. 60, 224 S. W. 635.

We have concluded that under the evidence shown in this case the decedent was a trespasser to whom precautionary duties were not owed by appellant. It follows that the motion of appellant for a peremptory instruction should have been sustained and if upon another trial the proof should be substantially the same, and the same motion is made, it should be sustained.

In view of the decision reached herein it will not be necessary to consider any of the other points relied upon by appellant, all of which are specifically reserved.

Judgment reversed for proceedings consistent herewith.