Argued November 12; affirmed December 30, 1947

POWERS, as ADMINISTRATOR *v.* SPOKANE,
PORTLAND & SEATTLE RY. CO.
(Two Cases)
187 P. (2d) 960

*J. R. Patterson* (Klepper, Brown & Patterson, of Portland, on brief), for appellants.

*Manley B. Strayer* (with Hart, Spencer, McCulloch & Rockwood, of Portland, on brief), for respondents.

BAILEY, J.

These two actions,—both against the Spokane, Portland & Seattle Railway Company, one by L. L. Powers, as administrator of the estate of Loren Boggs, de-

ceased, and the other by L. L. Powers, as administrator of the estate of Clarence Edward Holbrook, deceased,—were consolidated in the circuit court for trial and again for the purpose of appeal in this court. Loren Boggs and Clarence Edward Holbrook, with three others, were killed when the automobile in which they were riding was struck by a train owned and operated by defendant corporation at a railroad crossing in Columbia county, Oregon.

The pleadings in the two cases before us are substantially the same. We shall therefore refer only to those in the first mentioned case. The amended complaint in that case alleges the death of Loren Boggs, the appointment of L. L. Powers, as administrator of his estate, and the incorporation of the defendant railway company. It then alleges as follows:

"That there is a private road in Columbia County, State of Oregon and that it runs in a general easterly and westerly direction and is located at a point approximately 1.4 miles east of the City of Westport in the State of Oregon and that the said defendant maintains railroad tracks and right of way running in a general northerly and southerly direction along highway No. 30 and that the said railroad tracks intersect and cross said private road at approximately right angles.

"That on the 30th day of April, 1944, plaintiff's decedent was riding as a guest passenger in an automobile owned and operated by Orville A. Boggs and was traveling west on said private road and at about the hour of 5:30 P. M. and at the railroad crossing heretofore referred to, defendant negligently, as hereinafter set out, operated its passenger train south on the said railroad crossing into and against the said automobile, carrying it 610 feet south on its right of way, inflicting severe injuries which later resulted in the decedent's death.

"That the said road herein referred to on which the railroad crossing was maintained had never been duly dedicated nor had it become a public road by adverse user, but that the defendant had knowingly permitted, consented, and acquiesced in the public using the road openly and notoriously, and for the public's own benefit for a long period of time, to-wit: seven years more or less, and that the acts and conduct on the part of the defendant were done with the intent and expectation that the public would rely thereon and that Orville Albert Boggs and his passengers, Loren Boggs and Clarence Edward Holbrook, members of the public, reasonably relying upon the defendant's acts and conduct went upon said road and said crossing without any knowledge that the road was a private road and that there was no reasonable means for them to determine that it was a private road and that thereby Orville Albert Boggs, Loren Boggs, and Clarence Edward Holbrook were misled into reasonably believing that said road and said crossing was a public crossing all to their damages as is more fully hereinafter set out."

The defendant is charged with negligence in failing: (1) to maintain a proper lookout; (2) to keep its passenger train under control; (3) to warn plaintiff's decedent of the approach of its train; (4) to stop so as to avoid colliding with the car in which plaintiff's decedent was riding; and (5) to maintain proper signals at said crossing warning approaching motorists of impending danger. It is further charged with negligence in traveling at an excessive rate of speed and in maintaining its right of way and railroad crossing "in such condition that an operator of a motor vehicle could not reasonably look out for an approaching train". It is averred that "the defendant's negligence was the proximate cause of the accident and of the said death of plaintiff's decedent."

It is further alleged that the deceased left no widow or surviving dependents and that the "action is maintained for the benefit" of his estate, and that his estate has been damaged by defendant's negligence in the sum of $10,000.

In its answer the defendant admits the death of Loren Boggs, the appointment of L. L. Powers, as administrator of his estate, and the incorporation of defendant company, and denies each and every other allegation contained in the amended complaint, "except as to the matters and things hereinafter expressly admitted, stated or qualified."

For a further, separate and affirmative answer defendant alleges that on the 30th day of April, 1944, while defendant's train No. 24 was proceeding in a general southerly direction near Kerry station in Columbia county, Oregon, "a collision occurred at a point thereon near the station where a certain private roadway crosses the defendant's tracks at grade," between the engine on defendant's train and an automobile owned and operated by Orville Albert Boggs, which was being driven "in a general westerly direction upon said private roadway and over said grade crossing, and in which car plaintiff's decedent was riding as a passenger" and as a result of such collision plaintiff's decedent sustained injuries which caused his death. Plaintiff's decedent and the driver of the automobile are charged by defendant with carelessness, recklessness and negligence in failing to keep a proper lookout for trains approaching the crossing and particularly for defendant's train No. 24, and in failing to listen for approaching trains. The driver of the automobile is charged with failure to stop his automobile before crossing the railroad tracks; to yield the right

of way to defendant's train; and to keep the automobile which he was operating under proper control. It is further alleged that plaintiff's decedent knew that the car in which he was a passenger was being driven in a "careless, reckless and negligent manner" and that he "failed to protest or remonstrate, but on the contrary acquiesced in and adopted each of the foregoing acts of negligence on the part of the" driver of the car as his own. The affirmative matters set forth in the answer were put in issue by the reply.

The consolidated cases were tried before the court and a jury and at the close of plaintiffs' cases in chief, on motion of defendant, judgments of involuntary nonsuit were entered, from which these appeals have been prosecuted.

Defendant's motion for nonsuit was based, in each case, upon the following grounds: (1) Plaintiff's failure to prove any act of negligence on the part of defendant; (2) plaintiff's failure to show that any act of negligence on the part of defendant was the proximate cause of the accident; and (3) contributory negligence of plaintiff's decedent in the respects charged in the answer. The motions were granted on the second ground above specified, but the judgments appealed from, if proper on any of the grounds assigned, must be affirmed. In passing upon the question whether the trial court was in error, we must consider the evidence in the light most favorable to plaintiffs.

The litigants and their counsel refer to and describe defendant's railroad as running north and south at the place of the accident, and we shall do likewise, although the maps introduced as exhibits indicate it as running more nearly east and west. Adjoining the railway company's right of way on the west and run-

ning parallel therewith is U. S. Highway No. 30, the paved portion thereof being about 18 feet in width. The private road here involved extends from the paved portion of the highway across the railroad track, at right angles therewith, to a log dump on Westport slough, a distance of about 170 feet, approximately 40 feet thereof being the distance between the highway and the west rail of the railroad track. This private roadway has a graveled surface and crosses the railroad track at grade.

On June 17, 1939, the defendant railway company granted to the Bradley-Woodard Lumber Company, a corporation, a permit to use that "certain private grade crossing known as the Erickson crossing," which is the one here involved, "for the purpose of hauling logs to its log dump near Kerry, Oregon, and for no other purpose", and in consideration of the issuance of such permit, the lumber company "agrees, at its expense, to provide a flagman at said crossing to protect the trains of the Railway Company against the Licensee's trucks while crossing the track at said crossing; said flagman to be on duty at all times when the Licensee's trucks, either loaded or empty, are crossing the track, it being understood that all of the Licensee's trucks, either loaded or empty, will come to a full stop and that the flagman will definitely establish the fact that no trains are approaching before said trucks cross the track." The permit further stipulated that "all work of constructing and maintaining said improvements shall be done, by and at the expense of the Licensee, in a manner satisfactory to the Railway Company" and that the rights therein "granted are personal to the Licensee" and not assignable "without the written consent of the Railway Company first obtained."

There is evidence that the Bradley-Woodard Lumber Company was not the only one that used the crossing. Jack Miller, who was living at the time of the accident with his parents, less than two hundred feet from the railroad crossing, testified that the road in question was a private one and was used in logging operations. He further testified:

"Q. Now Mr. Miller, state to what extent the road was used by parties other than the people carrying on the logging operation. A. What do you mean?

"Q. Don't you understand the question? A. No.

"Q. I think it is clear enough, but I will try to state it a little better for you, if I can. I want to know to what extent people used this road other than parties that were dumping logs in the slough. A. A lot of people. Some people went over and fished over there all the time.

"Q. Yes. How often would this occur? A. Just once in a while.

"Q. Can you estimate at all— A. Sometimes on Sundays.

"Q. Was there any other purpose besides fishing that people would go over there for? A. Not that I know of.

"Q. None whatsoever. Are there any buildings over across the crossing? A. Just the building that has got the motor in it to dump the logs.

\* \* \* \* \*

"Q. What is the condition of the road? By that I mean the road that leads off of the Columbia River Highway on to this log dump here. Describe it. A. It was a rock road.

"Q. It is a graveled road? A. Yes.

"Q. How wide is it? Is it wide enough for two cars? A. Yes.

"Q. Is there any difference in its appearance from an ordinary country road? A. A little wider, I think.

"Q. Which is the widest? A. The logging dump."

On cross-examination Mr. Miller gave the following testimony:

"Q. How many cars would you say you have seen in there at one time or another? A. You mean every so often?

"Q. Yes. A. Oh, ten—a lot of times people go over there.

"Q. You mean ten altogether or all at the same time? A. Not all at the same time; different times.

"Q. Ten, probably, altogether? A. Yes.

"Q. Over how long a period of time was that? A. Oh, sometimes in the evening when they go fishing, you know, and Sundays."

Raleigh W. Wheeler, a member of the Oregon State Police, testified that he had been stationed at Clatskanie, Oregon, for about five years, and that he had investigated this accident. He stated that he was "quite familiar with" this private road and had used it himself. He further stated:

"Q. What purpose do you use it for? A. I am in the fish and game division of the State Police, and there was some angling in the slough nearby. There is a good camp road coming down adjacent to the highway from Nicolai Mountain that I watch considerably. * * *

"Q. Now Officer, is this road we are speaking of where the accident occurred used generally by the public? A. Yes.

"Q. To what extent? From your observations there how many cars would use it daily, if any? A. Some days there would be none, I presume. Two or three or four would be common on week days. On Sundays I have seen eight or ten vehicles in there parked.

"Q. Then from your knowledge and from your

observation it is not uncommon for the public to use this road? A. It is not uncommon.

"Q. For how long a period has this existed? A. Oh, for several years. I don't know how long, whether it was — if that was the condition before five years ago I couldn't say.

"Q. What signs are there on the road there where you come off the highway or where you go over the crossing? A. There are no signs to my knowledge of any kind.

\* \* \*

"Q. Officer, is there any difference in the appearance of this road where the accident occurred and any other county public road where you travel? A. No. No, it resembles a county road."

Plaintiffs called as their witness Reginald A. Grubb who had been in the employ of the defendant corporation for over 35 years and who had been on the Portland-Seaside run for 15 years. He was the conductor on the passenger train involved in the collision. He stated that he had seen only log trucks using the crossing. John J. Carroll, the fireman on the same train, also a witness called by the plaintiffs, testified that he had never before seen any cars on the private roadway.

The train involved in the accident was a southbound passenger train consisting of the engine and five cars and was traveling about 40 miles per hour. It had stopped at the city of Westport which was approximately a mile and one-half to the north of the scene of the accident. Approximately one-half of a mile north of the crossing the train ran over two torpedoes and thereupon the engineer, following the usual custom, sounded the locomotive whistle twice. Carroll, the fireman, saw the car in which Loren Boggs and Clar-

ence Edward Holbrook were passengers when the train was about two hundred feet from the crossing. He stated as follows:

"A. The first thing when I seen the car—I didn't get a full glimpse of the car. I just seen the top of it over the brush along the right of way, and I kept it in view. And it was moving very, very slowly. And finally when we got so close that I seen it was dangerous, why, I hollered over to the engineer 'Whoa,' which is the quickest way of telling them to apply the air, which he immediately done to stop the train.

"Q. How far were you from the crossing when you hollered 'Whoa'? A. Not over one hundred twenty-five feet.

\* \* \* \* \*

"Q. Did you assume that the car was going to stop before it went on the crossing? A. I assumed that the car would stop, and I thought everything was under control.

"Q. When you realized it was not going to stop; that it was going on the crossing, it was then that you immediately said 'Whoa' to the engineer? A. It was then that I called 'Whoa' to the engineer."

He then testified that the engineer applied the brakes immediately; that the train traveled about 610 feet from the point of impact; and that it "would have been impossible to have stopped any sooner under any conditions."

■ This court in *Doyle v. Portland Ry. L. & P. Co.,* 71 Or. 576, 143 P. 623, quoted with approval the following excerpt from 2 Thompson, Commentaries on the Law of Negligence, § 1725: "Where the public for years have been accustomed to cross the track of a railway company upon a well defined path, with the acquiescence of the company, although without its express license, a license to do so will be presumed,

and persons so crossing to and fro are not, in a strict sense, trespassers, but are licensees, and the company is bound to take reasonable precautions to avoid injuring them.'' In support of the foregoing text the opinion in the Doyle case referred to and quoted from numerous cases in other jurisdictions. The rule adopted in what appears to be the best reasoned, and the majority of, cases is in accord with the principle above enunciated. Briefly stated it is: If the evidence shows that the public has for a long time customarily and constantly, openly and notoriously, crossed a railroad track at a place not a public highway, with the knowledge and acquiescence of the railroad company, a license or permission by the company to all persons to cross the track at that point may be presumed and the railroad company is under a duty to keep a lookout for them and to exercise reasonable care in the movement of its trains at points where it is bound to anticipate their presence. Anno., 120 A. L. R. 1084 and 167 A. L. R. 1256.

■ Most of the instances involving the liability of railroads for collisions at other than public crossings relate to accidents occurring on well-defined paths in thickly settled communities. Anno. 120 A. L. R. 1076 and 167 A. L. R. 1253. The presence of such a path is in many instances a warning to the company that persons are in the habit of crossing the track at that point. *Wise v. Chicago, R. I. & P. Ry. Co.*, 335 Mo. 1168, 76 S. W. (2d) 118. The extent of use by the public of a railroad crossing necessary to form the basis of legal liability toward one who otherwise would be a trespasser cannot be defined with exactitude. It is stated in *Louisville & N. R. Co. v. Arrowood's Adm'r*, 280 Ky. 658, 134 S. W. (2d) 224, that the ''locality of

each accident has an important bearing in the effort to determine whether people should be expected upon the track at the place involved. A thickly settled place, as a town or village, is one element to be considered. A sparsely settled, remote place is another."

The mere use of a railroad crossing by the public does not convert the users thereof from trespassers to licensees unless this use is at a place habitually used by the public in such large numbers that the presence of persons on the track at that place should be anticipated. *Louisville & N. R. Co. v. Foust,* 275 Ky. 435, 118 S. W. (2d) 771, and cases cited. The sufficiency of the proof to authorize a submission to the jury of the question whether the use of the crossing is by such a number of people for such a period of time as to charge the railroad company with notice of its use is a matter of law to be decided by the court. Defendant, in its answers, denied that it had permitted or acquiesced in the use of the crossing by the public. Two of defendant's employees, the conductor and the fireman on the train involved in the accident, were called as witnesses by the plaintiffs and both denied that they had seen any use of the crossing other than by log trucks. No other employee or person connected with the defendant corporation testified. The testimony of the two witnesses, Jack Miller and Raleigh W. Wheeler, as to the extent of the use of this private crossing, showed only an occasional or sporadic use thereof. Officer Wheeler stated that "Some days there would be none, [cars] I presume. Two or three or four would be common on week days. On Sundays I have seen eight or ten vehicles in there parked." The testimony of Miller was of a similar nature and did not indicate any greater use of the roadway. There is no evidence as to where these cars were from, whether or

not they were the same or different cars, or whether they had permission to use the roadway.

Plaintiffs not only alleged that this was a private crossing, which was admitted by defendant, but also introduced the written permit by the railway company to the Bradley-Woodard Lumber Company to use it as a private crossing. The maintenance of the crossing was a duty imposed upon the lumber company by the permit, and the lumber company was to use the crossing only under stipulated restricted conditions. The crossing is located in a sparsely settled community and the private roadway does not extend to any residence or manufacturing plant. It was used by the lumber company to reach the Westport Slough, approximately 130 to 140 feet from the railroad track, into which its logs were dumped.

■ In our opinion the proof of the use of the crossing by the public was insufficient to authorize the submission to the jury of the question whether or not the railway company knew or should have known of such use and acquiesced therein or had reason to anticipate the presence of cars on its track at that place. *Louisville & N. R. Co. v. Arrowood's Adm'r,* supra. As we have hereinbefore stated, there was no evidence that the railway company had actual knowledge of the use of this crossing other than by the lumber company.

The train was approximately 200 feet from the crossing at the time the fireman first observed the car, in which the decedents were passengers, approaching the crossing. He presumed, which he had a right to do, that the car would stop. When the train was approximately 125 feet from the crossing, it appeared to the fireman that the car was not going to stop and he immediately rang the bell and caused the brakes to

be applied. Had the brakes been applied at the time the fireman first observed the automobile the train could not have been stopped in time to avoid a collision, as it traveled about 610 feet from the point of impact.

■ Under the facts as disclosed by the record in this case the decedents were trespassers upon the right of way of the defendant company and, inasmuch as the defendant was not guilty of reckless or wanton conduct, it was not liable to the plaintiffs for the death of the decedents.

The judgments appealed from are therefore affirmed.